# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS .....................................................................................4

    A.    Druker's initial employment.......................................................................4

    B.    Druker's initial employment in the Center ................................................4

    C.    The October, 1998 incident........................................................................8

    D.    Alleged discriminatory comments by Dr. Turner ......................................9

    E.    Druker complains to the Human Resources Department and EEOC and
        seeks to transfer out of the Center...........................................................12

    F.    Deterioration of Dr. Turner's and Druker's relationship, despite the
        absence of discriminatory conduct...........................................................14

    G.    Dr. Turner's resignation from TJU resulting in the elimination of Plaintiff's
        position.....................................................................................................15

    H.    Druker's complaint to Dr. Merli about Dr. Turner.................................16

    I.    Druker's efforts to transfer to another position at TJU after learning that
        Dr. Turner intended to resign ..................................................................18

    J.    Druker involves legal counsel in a final effort to extract an alternative
        position at TJU.........................................................................................21

    K.    Druker's second EEOC charge and receipt of Notices of Right to Sue .................22

III.  PROCEDURAL HISTORY....................................................................................23

IV.   STANDARD OF REVIEW ...................................................................................23

V.    ARGUMENT .........................................................................................................24

    A.    Druker's Title VII claims arising out of her first EEOC charge are time
        barred .......................................................................................................24

    B.    Druker's Title VII claims based on her first EEOC charge fail to state a
        claim because Plaintiff cannot establish a prima facie case of religious
        discrimination or retaliation ....................................................................26

1.      Druker did not suffer an adverse employment action prior to notification of her termination ...................................................................27

2.      Druker cannot establish that any similarly situated non-Jewish employee was treated more favorably ......................................................28

C.      Druker's claim of a religiously hostile work environment under Title VII must be dismissed because the alleged religious harassment was not severe or pervasive ...............................................................................................30

D.      Druker cannot establish a prima facie case of retaliation or that Defendants' legitimate, non-retaliatory reasons for her termination or failure to be transferred to an alternative position at TJU are pretextual...............34

E.      Defendants are entitled to summary judgment on all of Druker's PHRA claims ...............................................................................................................39

1.      Druker's retaliation claims under the PHRA relating to her termination and denial of transfer to another position are time barred because Plaintiff failed to file her second EEOC charge 180 days of the alleged retaliation ....................................................39

2.      The Title VII deficiencies in Druker's discrimination, harassment and hostile work environment apply to her parallel PHRA claims ...........40

F.      Druker's claim of negligent supervision is barred .................................................41

G.      Druker's allegations of defamation are time-barred and are not actionable..........42

VI.     CONCLUSION.....................................................................................................46

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| SONDRA G. DRUKER | : | |
| | : | CIVIL ACTION |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | |
| THOMAS JEFFERSON UNIVERSITY | : | NO. 02-CV-2692 |
| | : | |
| **and** | : | |
| | : | |
| BARBARA J. TURNER, M.D. | : | |
| | : | |
| **Defendants** | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**I.     INTRODUCTION**

Dr. Barbara Turner is a nationally-renowned medical doctor who has performed vital research concerning the epidemiology and clinical course of HIV with a focus on women, children and vulnerable populations.  From 1984 through December of 1999, Dr. Turner was a faculty member of Thomas Jefferson University ("TJU"), working in its Center for Research in Medical Education and Healthcare for Research ("the Center").  In addition to her research and teaching responsibilities, while at TJU, Dr. Turner maintained a clinical practice for the treatment of patients, was the medical editor of the medical journal *Hippocrates*, served on the editorial board of the *Annals of Internal Medicine* and the *Journal of General Internal Medicine*, among others, served on the Council of the Society of General Internal Medicine, a leading

academic group of general internists in the United States, and served on the National Institutes of Health (NIH) study section, which reviewed grants for the NIH. (Exhibit 1).

Dr. Turner's demanding workload required that she have an administrative assistant capable of performing a broad range of duties ranging from routine clerical assistance to higher level coordination associated with the preparation of grant applications. For approximately three years, from February, 1997 until the end of 1999, Plaintiff Sondra Druker worked as Dr. Turner's sole administrative assistant/coordinator. During Druker's tenure, the position title was changed to Clinical Research Assistant/Coordinator so that the position could be substantially funded through Dr. Turner's research grants, and only partially subsidized by TJU.

According to the testimony of all parties and witnesses in this case, Dr. Turner and Druker had a difficult relationship marked by Druker's complaints that she was chronically overworked, yelled at, criticized and forced to work harder than the other members of the support staff in the Center who worked for other supervisors.

The relationship ended in December, 1999 when Dr. Turner accepted a faculty position at the University of Pennsylvania beginning in January, 2000. Because Druker's position was dependent on Dr. Turner's grant funds, Dr. Turner's departure resulted in the elimination of Druker's position. Through her own networking and with the assistance of TJU's Human Resources Department, Druker applied for or was interviewed for a number of other positions at TJU in late 1999, but she did not receive any offers. However, Druker was successful in immediately obtaining higher paying new employment outside of TJU.

While Druker's Complaint contains numerous counts, there are in substance two distinct allegations at the heart of all of her present claims. First, Druker claims that TJU, through the conduct of both Dr. Turner and Druker's clerical co-workers in the Center, engaged in religious

harassment and/or discrimination against her based upon her alleged status as "an observant Jew." Second, Druker claims that her termination by TJU (the only adverse employment action which Druker experienced at TJU) in lieu of being transferred to another occurred in retaliation for her complaints to the TJU Human Resources Department and to the EEOC about the alleged discrimination.

After a vast amount of discovery, Druker cannot sustain her claims. The evidence of alleged religious harassment and discrimination, even if Druker's version of disputed events is accepted, consists of a handful of incidents occurring sporadically over Druker's three years in the Center. None involved an adverse employment action or anything that could be deemed to create a "hostile work environment." Moreover, Druker's Title VII claim for discrimination relating to matters preceding her termination is barred by Druker's failure to file her lawsuit within 90 days of receipt of the EEOC right-to-sue letter with respect to this claim.

As to the retaliatory discharge/failure to transfer claim, Druker cannot refute the evidence that her termination from TJU occurred for a manifestly, non-discriminatory reason - the departure of Dr. Turner and the resulting elimination of Druker's position.

Although Druker alleges in her Complaint that Dr. Turner further retaliated against her by interfering with Druker's search for new positions at TJU after Dr. Turner's announced departure, there is no evidence to support that claim. None of the numerous people who interviewed Druker for available positions were even aware that she was pursuing discrimination claims against TJU, and each rejected Druker for specific reasons relating to Druker's qualifications for the job in question or the lack of an available position rather than any information supplied by Dr. Turner. There is no evidence that Druker was rejected for any position based on interference by Dr. Turner.

For these reasons, both TJU and Dr. Turner are entitled to summary judgment on all claims.

## II.    STATEMENT OF FACTS

### A.    Druker's initial employment

Druker was hired as a full-time employee of TJU in October 1995 and started in the Department of Pathology as an administrative assistant.  (Deposition of Sondra Druker (hereinafter "Druker Dep.") at 64, 67, relevant excerpts of which are attached as Exhibit 2). While in the Department of Pathology, Druker claims that Dr. Bruce Fenderson, one of her supervisors, sexually harassed her.  (Druker Dep. at 49-50).  However, Druker never filed a charge of discrimination with the EEOC or PHRC relating to Dr. Fenderson's alleged sexual harassment because she was satisfied with TJU's remedial efforts.  (Druker Dep. at 70, 100-101).

### B.    Druker's initial employment in the Center

Once Druker decided to leave the Department of Pathology, she interviewed for an administrative assistant position with Dr. Turner.  (Druker Dep. at 87-88).  Dr. Turner was the Director for the Division of Healthcare Research at the Center, had a patient practice and was a professor at TJU.  (Deposition of Barbara J. Turner, M.D. (hereafter "Turner Dep.") at 8-9, 46, relevant excerpts of which are attached as Exhibit 3).  In the interview, Dr. Turner explained to Druker that her duties would be mostly clerical support for her in all of her work, specifically working on the computer, making copies, and assisting with putting grant applications together from a clerical perspective.  (Druker Dep. at 89-91, 103-04).

Druker learned early during her tenure in the Center that her compensation was dependent in large part on research grants awarded to Dr. Turner.  (Druker Dep. at 91-92).

Druker's initial job title was Administrative Assistant.  (Druker Dep. at 88).  About a year after she started in the Center, Dr. Turner changed Druker's job title to Clinical Research

Assistant/Coordinator because funding sources would not pay for work performed by an

Administrative Assistant and because she hoped Druker would perform greater responsibilities.

(Druker Dep. at 101-02; Exhibit 4; Turner Dep. at 53-54; Deposition of Craig Newschaffer,

(hereinafter "Newschaffer Dep.") at 86, relevant excerpts of which are attached as Exhibit 5).

Although Druker did not believe she was part of the support staff after her title change (Druker

Dep. at 106-109), Druker's job duties did not change as a result of the change in job title.

(Druker Dep. 103-04; Turner Dep. at 53-56).  Druker was still supposed to serve as an

administrative assistant for Dr. Turner and her projects.  (Newschaffer Dep. at 22).

       Druker reported directly to Dr. Turner.  (Druker Dep. at 109).  Druker was the only

member of the Center's support staff that was specifically assigned to work for Dr. Turner.

(Druker Dep. at 241-42).  The only other TJU employees who reported to Dr. Turner included

Daozhi Zhang, a programmer and data analyst who has a masters of science in statistics and was

working towards his doctorate in statistics, James Cocroft, a senior statistical analyst (Deposition

of James Cocroft (hereinafter "Cocroft Dep.") at 9, relevant excerpts of which are attached as

Exhibit 6), and Dr. Craig Newschaffer, an assistant professor and research associate who has a

Master of Science and doctoral degree in epidemiology (Newschaffer Dep. at 7, 8, 38-39; Druker

Dep. at 109-10).  Dr. Newschaffer left TJU in June, 1999 for a job at Johns Hopkins.

(Newschaffer Dep. at 13).  Dr. Turner's research grants supported Druker's position as well as the

positions of the other TJU employees who reported directly to Dr. Turner.  (Newschaffer Dep. at

17).  Dr. Turner had no supervisory responsibility over any other employee of the Center,

including the other three members of the Center support staff besides Druker.  These three

employees, Ellen Shepherd, Elizabeth ("Beth") Montanti, and Theresa Wilson, all reported

directly to others.  (Druker Dep. at 110-111, 114).  The managing director of the Center was

Daniel Louis, who is Jewish.  (Deposition of Daniel Louis (hereinafter "Louis Dep.") at 6-7, 89,

relevant excerpts of which are attached as Exhibit 7).

Druker admits that she was not subject to religious discrimination from any of her co-

workers for the first year and a half of her employment in the Center.  (Druker Dep. at 119).  In

particular, none of her co-workers ever used a religious epithet during her employment at the

Center.  (Druker Dep. at 127-28).  There were occasional discussions of religion in the

workplace.  For example, on one occasion, another administrative assistant said to Druker, "You

are Jewish, aren't you," and at a different time, another co-worker said, "I heard you were

Jewish."  (Druker Dep. at 115-16, 199-200).  Druker concedes that such comments, while

perhaps ignorant, were not discriminatory.  (Druker Dep. at 115-16, 199-200).

Druker testified that around Christmas of 1997 a Star of David decoration that she put in

her cubicle had been taken down.  (Druker Dep. at 201).  Druker did not complain to anyone

about the Star of David being taken down and does not know who took it down.  (Druker Dep. at

201-02).

On one occasion Druker claims that a co-worker, put religious proselytizing material in

her mailbox that Druker believed to be "inappropriate."  (Druker Dep. at 135, 137).  When

Druker brought the incident to Dr. Turner's attention, Dr. Turner agreed that it was inappropriate

and that it should not happen again.  (Druker Dep. at 135-38).  In fact, Druker did not receive

any more religious proselytizing material in her mailbox again.  (Druker Dep. at 136-37).

Druker was not unhappy with Dr. Turner's response to this incident.  (Druker Dep. at 138).

In January, 1998, Druker found a memorandum posted in one of the elevators in a TJU

building had been defaced with swastikas drawn in the corners.  (Exhibit 8).  Druker brought the

memorandum to the attention of Dr. Turner, Human Resources and Security.  (Exhibit 8; Druker

Dep. at 141). According to Druker, Dr. Turner was "dismayed" about the matter. (Druker Dep. at 138-39; Exhibit 8). In fact, Druker admits that everyone to whose attention she brought the memorandum agreed that the action was totally inappropriate. (Druker Dep. at 139, 141). However, since neither Druker nor anyone else knew who drew the swastikas on the memorandum, or whether it was drawn by a random visitor to TJU or employee of TJU, not much could be done. (Druker Dep. at 140-41).

Dr. Turner and Druker had a contentious working relationship throughout most of Druker's employment in the Center.[1] Druker repeatedly complained that she was forced to work long hours without proper overtime compensation and that Dr. Turner expected her to perform routine clerical work as well as higher level professional work. (Druker log, relevant excerpts of which are attached as Exhibit 9, 10037, 10063, 10064, 10069, 10073, 10077, 10078, 10086, 10087, 10104). Druker claims that Dr. Turner slapped her on the head to get her attention when she was on the telephone. (Druker Dep. at 175-76).

In June, 1998, Druker sent Dr. Turner an e-mail captioned "moving on" in which Druker informed Dr. Turner of her intention to look for alternative employment because of her "discomfort and dissatisfaction with conditions at the Center and the fact that I am constantly asked to produce more work than could reasonably be expected in one day and/or by one individual; certainly a good deal of this is owing to the fact that I perform so many jobs as opposed to the rest of the support staff . . . . " (Exhibit 10). The e-mail does not reflect that Druker believed she was being discriminated against based on her religion. (Exhibit 10; Druker

---

[1]    Those who worked with Dr. Turner and Druker also testified that Dr. Turner and Druker had a contentious working relationship. (Newschaffer Dep. at 39-41; Cocroft Dep. at 31). Dr. Newschaffer explained that Dr. Turner's and Druker's working styles "did not jibe very well" in that Dr. Turner's style was very streamlined and direct and Druker's style was to perform every task in a way that made it seem like a "Herculean accomplishment." (Newschaffer Dep. at 39-41).

Dep. at 191).  Druker testified that Dr. Turner responded to this e-mail by requesting her not to leave.  (Druker Dep. at 193).

Druker had interpersonal problems with the other support staff at the Center, including Shepherd, Montanti and Wilson.  (Druker Dep. at 114).  One constant source of contention between Druker and the other support staff was who would cover the receptionist duties for the Center.  (Druker Dep. at 131-132; Turner Dep. at 89-90; Exhibit 11).  Druker believed that her responsibilities to Dr. Turner did not permit her to share in the receptionist responsibilities.  (Druker Dep. at 131).  Druker also testified that the other secretaries in the Center did not want to reciprocate for her willingness to cover their receptionist responsibilities.  (Druker Dep. at 121-22).

**C.**    **The October 1998 incident**

The receptionist coverage issue came to a head in October 1998 when the other support staff in the Center refused to cover for Druker's receptionist duties when she was scheduled to be off from work for two days to attend a conference.  Druker sent Louis, the managing director of the Center, an e-mail directing him to hire a temporary employee to cover her receptionist duties while she attended the conference, and further demanding that the cost of hiring the temporary employee should come from the Center's budget rather than Dr. Turner's grant monies.  (Exhibit 12).  Mr. Louis objected to the content and tone of the e-mail, noted that there appeared to be tension between her and the other support staff in the Center and observed that her attitude towards her job and the Center staff needed to change.  (Exhibit 13).  This incident unfolded when Dr. Turner was in California meeting with the Chairman of the Department of Medicine of the University of California.  (Turner Dep. at 79-81).

This incident caused ill-feelings between Druker and Ms. Shepherd.  (Druker Dep. at 125), and was clearly a turning point.  Immediately after it occurred, Druker began keeping a log

of events in the Center.  (Druker Dep. at 116-19).  Druker used computer rooms on TJU's campus to prepare logs before work, after work or during breaks.  (Druker Dep. at 157-58). Druker sometimes jotted down a word or phrase on a piece of paper until she could get to the computer room to prepare the log.  (Druker Dep. at 158).  Druker tried to prepare the log entries close in time to the event being recorded.  (Druker Dep. at 158-59).  Gaps of time in the log probably signify that nothing noteworthy happened.  (Druker Dep. at 161).

Also around this time, Druker again sought alternative employment within TJU.  In October 1998, she contacted Dr. James Erdmann, who was then Senior Associate Dean for Faculty Affairs at Jefferson Medical College, and met with him over lunch to discuss potential employment with him or in the Dean's office, but she was not offered a position.  (Exhibit 14; Druker Dep. at 370-372; Deposition of James Erdmann, Ph.D. (hereinafter "Erdmann Dep.") at 6, relevant excerpts of which are attached as Exhibit 15).  Druker testified that she did not know whether Dr. Erdmann ever spoke with Dr. Turner about her.  (Druker Dep. at 373, 376-77).[2]

### D.    Alleged discriminatory comments by Dr. Turner

Also around October 1998, Druker claims that Dr. Turner for the first time discriminated against her based on her religion.  Druker claims that, in October 1998, Dr. Turner did not immediately approve her request for time off to observe Yom Kippur, one of the Jewish high holidays, and that she received approval only a couple of days before Yom Kippur began.

---

[2]     In his deposition, Dr. Erdmann testified that he never spoke with Dr. Turner about Druker (Erdmann Dep. at 18, 23) and that he decided not to offer Druker a position because she was "pretentious, overly aggressive, somewhat arrogant and did not strike me as being a team player."  (Erdmann Dep. at 15).

(Druker Dep. at 23, 30-31).[3]  However, on no occasion did Dr. Turner ever deny her request for time off to observe a Jewish holiday.  (Druker Dep. at 27).[4]

When she returned from the Yom Kippur holiday, Druker claims that Dr. Turner said to her "So, do you people have anymore goddamned holidays, or what?"  (Druker Dep. at 147).[5]

On November 3, 1998, Druker sent her first written communication to TJU's Human Resources Department, specifically Johanna Schoeller, about her treatment in the Center.  (Exhibit 16).  In the last of Druker's three conversations with Schoeller, Druker threatened that if the discriminatory conduct she was experiencing did not stop, she would file a complaint with the EEOC.  (Druker Dep. at 226-27).  Druker alleges that Schoeller responded by stating "take your best shot, but you're not going to win because Dan Louis is Jewish" (Druker Dep. at 227), to which Druker responded that "He's not an observant Jew.  I am talking about being observantly Jewish."  (Druker Dep. at 227).

In December 1998, Dr. Turner requested that Druker not take a vacation that she planned for the week of December 28 because Dr. Turner had an important grant application that had to be received the first working day in January 1999.  (Druker Dep. at 404; Turner Dep. at 32).  According to Druker, when Dr. Turner told her not to take her vacation, Dr. Turner said "this wasn't [your] holiday anyway, so [you] wouldn't be disappointed . . . its not like Santa was

---

[3]    In 1998, Yom Kippur began at sundown on Tuesday, October 29, 1998 and lasted until sundown on Wednesday, October 30, 1998.  Although Druker's log begins on October 21, 1998, over a week before Yom Kippur began in 1998, there is no reference to this incident in her log.

[4]    Druker does not recall any similar problems in 1997 or 1999 with respect to requests for time off to observe Rosh Hashanah or Yom Kippur.  (Druker Dep. at 30, 35-37).

[5]    There is no reference to this comment in Druker's log and Dr. Turner denies making this comment.  (Turner Dep. at 125-26).

coming to [your] house." (Druker Dep. at 151-153).[6]  Druker acknowledges that Christmas was

not her holiday, but claims she was offended by this comment because it referred to her religious

preference.  (Druker Dep. at 151-53).

Dr. Turner also requested that Druker work on Saturday, January 2, 1999, which is the

Jewish Sabbath, to complete this grant application, which had to be mailed that day.  (Exhibit 17;

Turner Dep. at 128; Complaint ¶ 21).  Druker agreed to do so, and Dr. Turner was not aware that

Druker had any religious-based objection to working on the Sabbath.  (Exhibit 17; Turner Dep.

at 128-29).  Druker testified that she "tried to stop work by sundown" on the Sabbath because she

is an "observant Jew."  (Druker Dep. at 17-19, 227).  However, this preference is not based on

her strict adherence to Jewish law.  In fact, the only activity Druker avoids on the Sabbath is

working.  (Druker Dep. at 19).  Druker drives a car on the Sabbath (Druker Dep. at 23) and goes

shopping on the Sabbath.  (Druker Dep. at 20).  Druker has not belonged to a synagogue for over

five years and has not attended services at any synagogue for at least five years, even for the high

holidays of Yom Kippur and Rosh Hashanah.  (Druker Dep. at 24-25).  Other than Yom Kippur,

Rosh Hashanah and Hanukkah, which is not a Jewish high holiday requiring abstention from

work, Druker does not take off work for any other Jewish holiday.  (Druker Dep. at 25, 27, 455).

---

[6]     Contrary to Druker's deposition testimony, in Druker's December 4, 1998 log entry, which Druker recorded contemporaneously with this incident, Druker does not quote Dr. Turner as saying "its not like Santa was coming to your house."  (Druker Dep. at 157-59, 162-64).  Instead, Druker quotes Dr. Turner as saying "Well, Christmas isn't exactly your holiday so you don't have your heart set on it . . . .  I mean, you have Hanukkah and I have an RO1 that has to go in so we have the money to pay you."  (10048).  An RO1 is a class of NIH grant which is investigator initiated and usually requests substantial money.  (Turner Dep. at 160-61).

E.    **Druker complains to the Human Resources Department and EEOC and seeks to transfer out of the Center**

After the alleged religious comments by Dr. Turner, Druker again went to TJU Human Resources.  By this time, Schoeller was on maternity leave and Druker was instructed to talk to Eric Righter, another Human Resources employee.  (Druker Dep. at 266-68).

On February 3, 1999, Druker met with Eric Righter in Human Resources for the first time to inform him about problems with Dr. Turner.  (Druker Dep. at 268-70; Exhibit 18, attachment A).  In this first meeting, Druker claims she informed Righter about her prior meetings with Schoeller, particularly Schoeller's alleged statement to "take her best shot" and asked Righter to find an amicable solution to her problems in the Center.  (Druker Dep. at 268-70).  Druker spoke with Righter a few more times both about discrimination and transferring to another position. (Druker Dep. at 270, 272-73, 275; Exhibit 18, attachment A).

According to Righter's summary of his interactions with Druker, Druker informed him that Dr. Turner asked her to work around the Christmas holiday because other employees had requested time off and that Dr. Turner said "it shouldn't be a problem for you, its not your holiday."  (Druker Dep. at 650-51).  Druker also informed Righter of other similar statements, that Righter concluded were, at most, insensitive.  (Druker Dep. at 270, 272-73, 275; Exhibit 18, attachment A).  When Righter told Druker he would contact Dr. Turner, Druker asked Righter to wait until she met with Louis, but Righter did not hear back from Druker until mid-summer 1999.  (Exhibit 18, attachment A).  According to Righter, Druker never complained about discrimination to him again, even though he worked closely with her from July to October, 1999 to help her transfer to another position.  (Exhibit 18, attachment A; Exhibit 19).

Also, in early 1999, Druker contacted Mary Legner, Placement Specialist in the Office of Employee Selection and Placement, requesting assistance in finding alternative employment

within TJU. (Exhibit 18, attachment B; Exhibit 20). According to Druker, Legner informed

Druker that she was not aware of any suitable position, although Legner did forward Druker's

resume to Aaron Schecter and Roseann Bonanni, who declined to interview Druker, so Druker

"continued to pursue options on [her] own." (Exhibit 18, attachment B; Exhibit 20).[7]

In the spring of 1999, Druker interviewed with Dr. Bruce Boman, Director of the

Divisions of Medical Oncology and Medical Genetics, for a position as a science writer. She did

not receive an offer. (Druker Dep. at 392-94). Without contacting Dr. Turner, Dr. Boman

concluded that Druker was not qualified for the position. (Affidavit of Dr. Bruce Boman

(hereinafter "Boman Affidavit") ¶ 4-5, attached as Exhibit 21).

On June 4, 1999, Druker filed a charge of discrimination and retaliation with the EEOC

asserting that TJU treated her differently because of her age, race, sex and religion (Jewish),

created a hostile work environment and retaliated against her for complaining about

discrimination. (Exhibit 22). Druker obtained legal advice prior to filing this charge. (Druker

Dep. at 73-74). The EEOC did not initially docket this charge because it provided insufficient

information. (Exhibit 23). On November 15, 1999, Druker filed an amended charge asserting

that her supervisor (Dr. Turner) treated her differently because of her sex and religion, subjected

her to sexual and religious harassment and retaliated against her for complaining about

discrimination. (Exhibit 24). This charge was subsequently docketed as Charge No.

170A00980. (Exhibit 24). TJU received notice of this charge from the EEOC on March 28,

2000, long after Druker's employment had ended. (Affidavit of William D. Cook, EEOC, ¶ 5(n),

attached as Exhibit 25).

---

[7]     Although she could not recall the date, Druker testified that she interviewed with Dr.
Schecter for a position at the Headache Center, but did not receive an offer. Druker
testified that she has no evidence that Dr. Turner was in any way responsible for her not
being offered the position. (Druker Dep. at 387, 403-05).

Around the same time as the filing of the charge, Druker claims that she complained about religious discrimination to Dr. Turner. Druker testified that she gave Dr. Turner a memorandum dated June 10, 1999 in which she complains about discrimination and retaliation. (Druker Dep. at 294-97; Exhibit 26).

Druker also claims that she gave Righter a memorandum dated June 1, 1999 in which she complained about discrimination and retaliation by Dr. Turner and others in the Center. (Druker Dep. at 258-61; Exhibit 27). Druker cannot recall how she transmitted this memorandum to Righter and does not recall getting an acknowledgement from Righter. (Druker Dep. at 258-261, 273-74).[8]

**F.   Deterioration of Dr. Turner's and Druker's relationship, despite the absence of discriminatory conduct**

Druker's log for the last six months of 1999 is devoid of any evidence that there were additional anti-Semitic comments by Dr. Turner or co-workers after Druker complained to Human Resources and the EEOC. However, the log is replete with Druker's observation that Dr. Turner and her co-workers were "discriminating" against her in personal interactions.[9]

In late August 1999, Druker claims that Dr. Turner smacked her on the head while she was on the telephone to get her attention and kicked a trash can at her while screaming obscenities. (Druker Dep. at 513-14). Druker reported this incident to Righter. (Exhibits 28, 29).

---

[8]    Once again, although Druker's allegations must be taken as true for purposes of this Motion, Righter denies ever receiving this memorandum. (Exhibit 19).

[9]    For example, Druker was miffed at being excluded from Dr. Newschaffer's farewell lunch, felt people were not properly saying good morning and good-bye to her, felt Dr. Turner treated her disrespectfully by referring to her as her assistant, and was unhappy with her workload. (Druker Log, Exhibit 9, see 10078, 10079, 10081, 10087, 10092, 10094, 10098, 10101, 10108, 10113).

Around October 1999, before Dr. Turner made a final decision whether to resign from TJU, Dr. Turner met with Brian Bowie, Director of Employee Relations and Human Resources Development for TJU, to discuss how her potential resignation from TJU would affect the employees who reported directly to her. (Turner Dep. at 118-19). Dr. Turner also spoke with Bowie about her dissatisfaction with Druker's work and how Druker could be transferred to another position in the event Dr. Turner remained at TJU. (Turner Dep. at 118-20). Ultimately, no action was taken to transfer Druker because Dr. Turner decided to resign from TJU to accept a position at the University of Pennsylvania.

**G.      Dr. Turner's resignation from TJU resulting in the elimination of Druker's position**

In late October, 1999, Dr. Turner decided to resign from TJU to accept a position at the University of Pennsylvania effective December 31, 1999. (Turner Dep. at 7-8). Dr. Turner informed Druker of her resignation on November 10, 1999, although Druker had heard rumors of her resignation prior to this date. (Druker Log, Exhibit 9, see 10135). As a result of Dr. Turner's resignation, TJU eliminated the positions of all of Dr. Turner's direct reports, including the positions of Druker, Zhang and Cocroft, because each of them worked directly for Dr. Turner on her grant research, which would no longer be performed at TJU, and because Turner's research grants, which TJU was going to lose, funded a significant portion of each of their positions. (Exhibit 18, Bowie Affidavit ¶ 3).[10] Druker received a letter from TJU dated November 30,

---

[10]      Mr. Zhang accepted Dr. Turner's request that he come with her to the University of Pennsylvania. Dr. Turner asked him to go with her because he was integral to the programming work on one of her ongoing research grants. (Turner Dep. at 21, 118-19). Because of potential immigration issues, however, it was agreed that Zhang would remain on the TJU payroll until those issues were resolved. During that period, he worked on Dr. Turner's research and TJU was reimbursed for his salary through the grant. His position was eliminated in August 2000 at which time he left the employment of TJU. (Exhibit 18, Bowie Affidavit, ¶ 3 n.1).

1999 officially notifying her that her position would be eliminated effective December 31, 1999 due to Dr. Turner's resignation from TJU.  (Exhibit 30).  Mr. Cocroft received a virtually identical letter.  (Exhibit 31).  In accordance with TJU's policy, Druker was assigned Mary Legner, a Placement Specialist from the Office of Employee Selection Placement, to assist her in finding new job opportunities at TJU.  (Exhibit 30).  Ms. Legner brought in a second person, Alison Keiser, to make sure all possible avenues for alternative employment were explored. (Exhibit 18, attachment B).

TJU also offered Druker a standard severance package in exchange for a General Release.  (Exhibit 30).

### H.    Druker's complaint to Dr. Merli about Dr. Turner

On November 3, 1999, after Druker had heard rumors that Dr. Turner was leaving, Druker met with Dr. Geno Merli, who was then the Division Director of General and Internal Medicine, to complain about Dr. Turner and conditions in the Center.  (Druker Log, Exhibit 9, see 10131-10132; Druker Dep. at 170-71; Deposition of Geno Merli (hereinafter "Merli Dep.") at 6, relevant excerpts of which are attached as Exhibit 32).  Dr. Turner was among twelve physicians/faculty members who reported to Dr. Merli as Division Director.  (Merli Dep. at 8). During the course of this conversation, Druker informed Dr. Merli that Dr. Turner had slapped her on the head to get her attention when she was on the telephone, among other complaints about Dr. Turner's conduct.  (Druker Dep. at 174-177).  Druker claims that Dr. Merli was sympathetic and told her "that there was a job coming up with a brand new project being put together by Dr. Capizzi, who was at the time the Chairman of the department; that this would be a research center, it looked like it was going to be well-funded . . . ."  (Druker Dep. at 179).[11]

---

[11]    Although Druker testified in her deposition that Dr. Merli referenced a job coming up with Dr. Capizzi, Druker's log on the same day as her meeting with Dr. Merli makes no

Druker is unsure whether the position had already been authorized or was in the planning stage, but stated it was her "impression" that they were "looking for this particular type of person for this particular project that's coming up with Dr. Capizzi." (Druker Dep. at 322). Druker sent her resume to Dr. Merli, but never heard back. (Druker Dep. at 326). In fact, the position never even existed or was created at the time. (Merli Dep. at 20).

Dr. Merli testified that he bumped into Dr. Turner at a nurses station while on rounds and mentioned to her only that he had spoken to Druker and was surprised to hear that Dr. Turner had hit Druker on the head. (Merli Dep. at 32). Dr. Merli did not inform Dr. Turner about his conversation with Druker regarding the potential position with Dr. Capizzi. (Merli Dep. at 33; Turner Dep. at 117). Dr. Merli testified that Dr. Turner was visibly upset to hear that Druker said she had hit her. (Merli Dep. at 32-33).[12]

Druker testified that Dr. Turner later approached her and yelled at her for telling Dr. Merli that she had hit Druker. Druker further testified that in this conversation with Dr. Turner, Dr. Turner allegedly referred to the position Druker had discussed with Dr. Merli and told Druker "that avenue is closed." (Druker Dep. at 328). Druker could not identify specifically what Dr. Turner said she had said to Dr. Merli about Druker that made Druker believe Dr. Turner was responsible for the closing of "that avenue." Druker simply stated "I came away understanding that she had told him negative things about me." (Druker Dep. 329-32).[13]

---

reference to Dr. Capizzi. (Druker Log, Exhibit 9, see 10131-32). In contrast, Druker wrote in the log that Dr. Merli "offered to take my resume in the hope that something came up before anything dire happened to me." (Druker Log, Exhibit 9, see 10132).

[12] Dr. Turner testified that she bumped into Dr. Merli when she was covering inpatient service and was "shocked" when Dr. Merli mentioned that Druker said that she had hit Druker. (Turner Dep. at 110-111).

[13] Dr. Turner testified that she knew nothing about the job with Dr. Capizzi and never spoke with either Dr. Merli or Dr. Capizzi about it. (Turner Dep. at 112-13).

I.     **Druker's efforts to transfer to another position at TJU after learning that Dr. Turner intended to resign**

After receiving notice of the elimination of her job, Druker accelerated her job search. She sought employment for numerous positions at TJU as described below.  As to each of these positions, there is no evidence that Dr. Turner had any contact with the interviewer or otherwise influenced the hiring decision.

1.  <u>Department of Psychiatry/Elizabeth Smith</u> - Druker submitted a resume to the Department of Psychiatry, but was not interviewed.  (Druker Dep. at 378-80).  Druker acknowledges she has no evidence that Dr. Turner was in any way responsible for her not being interviewed.  (Druker Dept. at 378-80).  According to Elizabeth Smith, Administrator for the Department of Psychiatry, Druker submitted the resume to a secretary for the position of Educational Coordinator and her resume was passed along to Smith.  (Affidavit of Elizabeth Smith (hereinafter "Smith Affidavit") ¶ 1, 2, attached as Exhibit 33).  At the time Smith received Druker's resume, she had already interviewed and made an offer to another candidate for this position who had significant teaching and hands-on educational testing experience.  (Smith Affidavit ¶ 2).  Smith never spoke with Dr. Turner about Druker and was not aware that Druker had complained about discrimination during her employment at TJU.  (Smith Affidavit ¶ 3, 4).

2.  <u>Division of Endocrinology/Thomas Falkowski</u> - Druker spoke with Thomas Falkowski regarding a position including the financial management and accounting of grants in the Division of Endocrinology, but was not given an offer.  Druker has no evidence that Dr. Turner was in any way responsible for her not getting an offer.  (Druker Dep. at 389-90, 403-05). Falkowski, Business Manager for the Division of Endocrinology, Diabetics and Metabolic Diseases, found Druker to be very pushy and concluded that her personality would not have meshed well with his and, since Druker would have reported directly to him in this position, this

was a significant factor in his decision not to hire her. (Affidavit of Thomas Falkowski

(hereinafter "Falkowski Affidavit") ¶ 1-4, attached as Exhibit 34). He never spoke with Dr.

Turner about Druker and did not know Druker had complained about discrimination during her

employment at TJU. (Falkowski Affidavit ¶ 5, 6).

     3.  <u>Division of Endocrinology/Dr. Barry Goldstein</u> - Druker recalls speaking with Dr.

Goldstein, but cannot recall for what position. (Druker Dep. at 390). Dr. Goldstein was the

Director of the Division of Endocrinology, Diabetes and Metabolic Diseases at TJU when

Druker submitted her resume for a grant position in the Division of Endocrinology which had not

yet been posted. (Affidavit of Barry Goldstein, M.D. (hereafter "Goldstein Affidavit") ¶ 1, 2,

attached as Exhibit 35). After interviewing Druker, Dr. Goldstein concluded that her personality

would not fit with him or with other employees in the office and therefore he did not make her an

offer of employment. (Goldstein Affidavit ¶ 2). Dr. Goldstein testified that his decision not to

hire Druker for this position was not influenced by Dr. Turner and that he never spoke with Dr.

Turner about Druker. (Goldstein Affidavit ¶ 3). Further, Dr. Goldstein testified that he was not

aware that Druker had complained about discrimination during her employment at TJU.

(Goldstein Affidavit ¶ 4).

     4.  <u>Sponsored Programs/Cheryl Scully/Eric Pownall</u> - Druker interviewed with Eric

Pownall for a financial coordinator position in Sponsored Programs, but did not get an offer.

Druker claims that Pownall said he would recommend her to Cheryl Scully, who was the head of

the department. Druker has no evidence that Dr. Turner was in any way responsible for her not

getting an offer. (Druker Dep. at 390-92, 401-05). Pownall was the Business Manager of

Sponsored Programs Accounting in the Controller's Office reporting to Scully when Druker

submitted her resume for the position. (Affidavit of Eric Pownall (hereinafter "Pownall

Affidavit") ¶ 1, 2, attached as Exhibit 36).  Pownall concluded that, based on his interview of Druker, she did not have sufficient experience in grants to qualify for the position.  (Pownall Affidavit ¶ 3).  Pownall never spoke with Dr. Turner about Druker and did not know that Druker had complained about discrimination during her employment at TJU.  (Pownall Affidavit ¶ 4, 5).  Scully was the Director of Sponsored Programs Accounting in the Controller's Office when Druker claims she spoke with Pownall about the position, and likewise did not speak with Dr. Turner about Druker.  (Affidavit of Cheryl Scully (hereinafter "Scully Affidavit") ¶ 1-3, attached as Exhibit 37).

     5.  <u>Regina Gallagher</u> - Druker testified that she called Regina Gallagher a couple of times regarding a position in the Microbiology Department.  (Druker Dep. at 206, 209).  Druker could not recall whether a position was available at the time she inquired with Gallagher.  (Druker Dep. at 209).  Gallagher was the Administrator of the Microbiology Department at TJU when Druker sought a position in that Department.  (Affidavit of Regina Gallagher (hereinafter "Gallagher Affidavit") ¶ 1-2, attached as Exhibit 38).  According to Gallagher, Druker requested an interview with her for a job and that she interviewed Druker even though no job was available because Druker stated she had been referred by someone Gallagher respected.  (Gallagher Affidavit ¶ 2).  During the interview, Druker spoke very negatively about Dr. Turner.  (Gallagher Affidavit ¶ 2).  When a grant accounting position in Microbiology subsequently became available, Gallagher was asked by Human Resources to interview Druker, but Gallagher said she had already interviewed Druker and that she was not qualified for the position and was aggressive.  (Gallagher Affidavit ¶ 3).  Gallagher never spoke to Dr. Turner about Druker and was not aware that Druker had complained about discrimination during her employment at TJU.  (Gallagher Affidavit ¶ 4-5).

6. <u>Dr. Ronald Myers</u> - Druker spoke with Dr. Ronald Myers about a position in the Division of Medical Oncology, but she was not interviewed. (Druker Dep. at 381-85). According to Dr. Myers, no position was available for someone with Druker's qualifications, and he did not pursue the matter further. (Affidavit of Ronald Myers, M.D. (hereinafter "Myers Affidavit") ¶ 2, attached as Exhibit 39). The only position that Myers had was for a statistical analyst, a position for which he hired James Cocroft, Druker's co-worker in the Center. (Myers Affidavit ¶ 3). Druker testified that when she subsequently spoke with Dr. Myers about the position, Dr. Myers told her that he had spoken with Dr. Turner about her. While Druker could not recall what Dr. Myers said, Druker testified that her impression was that it was not positive. (Druker Dep. at 381-85).[14]

**J.     Druker involves legal counsel in a final effort to extract an alternative position at TJU**

On December 17, 1999, Druker's attorney sent a letter to Righter alleging that Druker was discriminated against and harassed by Dr. Turner, thereby forcing her to file a Charge with the EEOC and PHRC. (Exhibit 40). In the letter, Druker's attorney notes that Druker's inability to obtain an alternative position at TJU and the elimination of Druker's position as a result of Dr. Turner's departure "raises the specter of retaliatory conduct." (Exhibit 40). Bowie responded to this letter on behalf of TJU claiming that the December 17, 1999 correspondence was the first notification TJU had regarding Druker's filing of a Charge with the EEOC and PHRC. (Exhibit 41).

---

[14]     Druker identified two other departments at TJU, including the Department of Radiology and the Department of Pediatrics, where she sought alternative employment. However, Druker cannot recall sufficient information about her efforts to obtain a position in these departments, such as when she sought the position and with whom she spoke, for TJU to respond. (Druker Dep. at 377-78, 380-81). Nevertheless, Druker testified that she had no evidence that Dr. Turner was responsible for her not receiving an interview or offer in either department. (Druker Dep. at 377-78, 380-81).

Despite Druker's attorney's letter, Druker did not obtain another position at TJU and her job was eliminated, as previously planned, on December 31, 1999.  However, Druker immediately obtained new employment that paid more than she made at TJU so Druker is not claiming any lost wages.  (Druker Dep. at 405).  In January, 2000, Druker began working for Wyeth making more per month than she made at TJU.  (Druker Dep. at 405-06).  Druker subsequently became employed for Astra Zeneca where she also made more than she did at TJU.  (Druker Dep. at 406).  Druker is also not seeking reinstatement or front pay.  (Druker Dep. at 407).

### K.     Druker's second EEOC charge and receipt of Notices of Right to Sue

On September 7, 2000, Druker filed a second Charge with the EEOC (Charge No. 170A01829) alleging that TJU and Dr. Turner retaliated against her for complaining about discrimination by terminating her employment and by interfering with her efforts to transfer to another position at TJU.  (Exhibit 42).

On September 24, 2001, Druker's attorney, Wayne Hamilton, Esquire, requested that the EEOC provide Druker with a right to sue letter for Druker's first charge - Charge No. 170A00980.  (Druker Dep. at 77-78; Exhibit 43).  The EEOC issued Druker a Notice of Right to Sue for Druker's first charge dated September 27, 2001, which Druker admitted receiving on or about October 1, 2001.  (Exhibit 44; Druker Dep. at 79; Druker's Answer to Interrogatory No. 16, Exhibit 45).  Druker read the Notice of Right to Sue, including the part which reminds the aggrieved person that a lawsuit under Title VII must be filed within 90 days from receipt of the Notice of Right to Sue.  (Druker Dep. at 81-82).  Druker admitted that she understood she would have to file her lawsuit based on her first charge (Charge No. 170A00980) within 90 days of her receipt of the Notice of Right to Sue.  (Druker Dep. at 82).  Druker further admitted that she did

not file a lawsuit based on claims asserted in her first charge (Charge No. 170A00980) within 90 days of her receipt of the Notice of Right to Sue.  (Druker Dep. at 82-83).

At Druker's request, on October 29, 2001, the EEOC issued Druker a Notice of Right to Sue on her second charge.  (Exhibit 46).

## III.    <u>PROCEDURAL HISTORY</u>

On January 29, 2002, Druker filed a Writ of Summons against TJU and Dr. Turner in the Court of Common Pleas of Philadelphia County.  (Exhibit 47).  On April 5, 2002, Druker assisted by counsel, filed a seven count <u>pro</u> <u>se</u> Complaint in the Court of Common Pleas of Philadelphia County asserting claims for sex and religious discrimination and retaliation under Title VII and the Pennsylvania Human Relations Act (PHRA), negligent supervision, and defamation.  (Exhibit 48)[15].  TJU and Dr. Turner removed the Complaint to this Court.

## IV.    <u>STANDARD OF REVIEW</u>

Summary judgment is required where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once this has been met, the non-moving party bears the burden to come forward with specific factual evidence demonstrating that there is a genuine issue for trial on <u>each</u> of the elements essential to the Druker's claim.  <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

---

[15]    There is no Count V in the Complaint.

The Supreme Court has emphasized that, to defeat a motion for summary judgment, the non-moving party must present specific "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "To survive a motion for summary judgment, the non-movant must adduce 'more than a mere scintilla of evidence in its favor and may not rely on unsupported assertions, conclusory allegations, or mere suspicions.'" Parry v. Jackson Nat. Life Ins. Co., 54 F. Supp.2d 473, 477 (E.D. Pa. 1999) (quoting Harley v. McCoach, 928 F. Supp. 533, 535 (E.D. Pa. 1996)); see also Diaconu v. Perry, C.A. No. 96-0214, 1996 U.S. Dist. LEXIS 17065, at *20 (E.D. Pa. Nov. 8, 1996) ("Mere conclusory allegations in the complaint are not sufficient to establish an inference of discrimination").

In this case, Druker's claims each suffer from distinct procedural and substantive defects which warrant summary judgment for Defendants.

## V.    ARGUMENT

### A.    Druker's Title VII claims arising out of her first EEOC charge are time barred

Druker's initial EEOC charge, asserting that she was subjected to religious discrimination, a religiously hostile work environment and retaliation in violation of Title VII, are part of Count I and II in this action. These claims are time-barred because Druker failed to file her lawsuit asserting these claims within 90 days of receiving her Notice of Right to Sue from the EEOC on her first filed charge.

Under Title VII, a claimant has 90 days after receipt of a right to sue letter to file a timely civil action, after which the right to sue is lost. 42 U.S.C. § 2000e-5(f)(1); Johnson v. Super Fresh Food Markets, Inc., C.A. No. 97-2315, 1998 U.S. Dist. LEXIS 8288, at *9-11 (E.D. Pa. May 29, 1998) (dismissing plaintiff's claim of racial preferences in job assignment because

plaintiff failed to file a civil action asserting this claim within 90 days of receipt of a right to sue

letter), *aff'd without opinion*, 178 F.3d 1279 (3d Cir. 1999), *cert. denied*, 528 U.S. 936 (1999).

It is undisputed that Druker failed to file her lawsuit asserting claims contained in her

first filed charge (Charge No. 170A00980) within 90 days of her receipt of the Notice of Right to

Sue on this charge.  (Druker Dep. at 82-83).  In Druker's first charge, as amended in November

of 1999, Druker asserted that TJU treated her differently because of her age, race, sex and

religion, created a religiously hostile work environment and retaliated against her for

complaining about discrimination.  (Exhibits 22, 24).  The EEOC issued Druker a Notice of

Right to Sue on her first charge on September 27, 2001, which Druker admitted receiving on or

about October 1, 2001.  (Druker Dep. at 79; Druker's Answer to Interrogatory No. 16, Exhibit

45).  Thus, the 90 day period within which Druker was required to file her lawsuit expired on

December 30, 2001.  However, Druker filed her lawsuit asserting the claims contained in her

first filed charge on January 29, 2002 by way of writ of summons, which is well beyond the 90

day limitation period.  (Exhibit 47).  Accordingly, Druker's right to sue on claims of sex and

religious discrimination, religiously hostile environment and retaliation based on Defendants'

conduct which was the subject of this charge are time-barred.

Druker's receipt of a Notice of Right to Sue based on her second charge of retaliatory

discharge does not revive Druker's time-barred claims of discrimination, hostile work

environment and retaliation in the first filed charge.  See Johnson, 1998 U.S. Dist. LEXIS 8288,

at *9 (if a claimant receives a right to sue letter on a first filed charge with the EEOC and does

not file suit within 90 days, a right to sue letter on a second EEOC charge will not revive the first

charge); Anderson v. Consolidated Rail Corp., C.A. No. 98-6043, 1999 U.S. Dist. LEXIS 13376,

at *4 (E.D. Pa. Aug. 25, 1999) (finding plaintiff's ADEA claim time-barred because he failed to

file suit within 90 days of receipt of his right to sue letter even though a second charge of

discrimination with the EEOC was pending); Strickland v. Stanley Smith Security, Inc., No.

97C3812, 1998 U.S. Dist. LEXIS 14411, at *8 (N.D. Ill. Sept. 8, 1998) (finding that plaintiff

could not use his second EEOC charge as a means of extending the 90 day limitations period for

the first EEOC charge because otherwise it would make the limitations period meaningless);

Mason v. State of Conn., 583 F. Supp. 729 (D. Conn. 1984) (holding that where a complainant

fails to bring a judicial action based on an administrative charge of discrimination within 90 days

of receiving notice of the right to sue, the subsequent filing of further administrative charges

does not revive the time-barred earlier claims).

> **B.     Druker's Title VII claims based on her first EEOC charge fail to state a
> claim because Druker cannot establish a prima facie case of religious
> discrimination or retaliation**

Druker claims that she was treated differently throughout her employment in the Center

because she is Jewish in violation of Title VII.  (Complaint, Count I).  To establish a *prima facie*

case of religious discrimination (disparate treatment) under Title VII, Druker must present

evidence that she:  (1) is a member of a protected class (Jewish); (2) is qualified for the position;

(3) suffered an adverse employment action under the circumstances that would give rise to an

inference of discrimination; and (4) is similarly situated to individuals who are not of the same

class and were treated more favorably.  Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410-

11 (3d Cir. 1999); Martin v. Enterprise Rent-A-Car, C.A. No. 00-CV-6029, 2003 U.S. Dist.

LEXIS 1191, at *11-12 (E.D. Pa. Jan. 15, 2003).[16]  Druker cannot establish a prima facie case of

---

[16]     The elements of a prima facie case depend on the facts of the particular case.  See
Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999); Torre v. Casio, Inc.,
42 F.3d 825, 830 (3d Cir. 1994).  To prove a prima facie case of retaliation, Druker must
also establish that she suffered an adverse employment action.  See Abramson v. William
Paterson College of New Jersey, 260 F.3d 265, 286 (3d Cir. 2001) (To establish a *prima
facie* case of retaliation, plaintiff must demonstrate that (1) she was engaged in protected

religious discrimination or retaliation (based on all events preceding her discharge/denial of transfer claim) because she did not suffer an adverse employment action and cannot identify any similarly situated non-Jewish employee who was treated more favorably.

      **1.**      **Druker did not suffer an adverse employment action prior to notification of her termination**

At the time Druker filed her first EEOC charge (filed in June, 1999 and amended on November 15, 1999) she had not suffered any adverse employment action. Thus, the charge and the claims in this case based on them, fail to state a Title VII claim.

The Supreme Court has defined a tangible, adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." Burlington Indus. Inc. v. Ellerth, 524 U.S. 742 (1998). The Third Circuit has held that the employer must take action that adversely affects the plaintiff with respect to an employment relationship, as opposed to conduct that the employee generally finds objectionable. See Nelson v. Upsala College, 51 F.3d 383, 387-88 (3d Cir. 1995). It is undisputed that the only adverse employment action suffered by Druker was her later termination and failure to be hired elsewhere at TJU when Dr. Turner left for the University of Pennsylvania.

Prior to that time, Druker's claims of discrimination relate to grievances over working conditions and personal relationships that do not involve an adverse employment action. For example, Druker alleges that Dr. Turner closely monitored her work hours, worked her harder than other staff members and made unreasonable demands on her. (Druker Log, Exhibit 9, 10023, 10024, 10034, 10044, 10067, 10068, 10070, 10077, 10084, 10087, 10090, 10092, 10093,

---

activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the protected activity and the adverse action).

10100, 10126). None of this alleged conduct amounts to a tangible, adverse employment action. It is clear that "not everything that makes an employee unhappy" qualifies as retaliation, for "otherwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'" Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997) (citing Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996)). To the extent Druker points to discriminatory or derogatory comments by Dr. Turner or others in the Center, the Third Circuit has found such conduct is not an adverse employment action. See Robinson, 120 F.3d at 1301 (holding that unsubstantiated oral reprimands and unnecessary derogatory comments were not adverse employment actions in a retaliatory conduct case).

Since Druker cannot establish that she suffered an adverse employment action prior to Turner's announced departure, Druker cannot establish a prima facie case of discrimination. Thus, Druker's Title VII discrimination and retaliation claims based on Defendants' alleged discriminating and retaliatory conduct prior to Dr. Turner's announced departure in Count I must be dismissed.

### 2. Druker cannot establish that any similarly situated non-Jewish employee was treated more favorably

Druker also cannot demonstrate that any similarly situated employee who is not Jewish was treated more favorably by TJU and/or Dr. Turner. Similarly situated employees are ones who have dealt with the same supervisor, who have been subject to the same standards and who have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. Morris v. G.E. Financial Assurance Holdings, et al., C.A. No. 00-3849, 2001 U.S. Dist. LEXIS 20159, at *22-23 (E.D. Pa. Dec. 5, 2001) (finding no inference of gender discrimination based on plaintiff's

failure to show that a co-worker was similarly situated as she reported to a different supervisor); Ogden v. Keystone Residence, et al., 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002) (holding no prima facie case because there was no indication that plaintiff's comparator dealt with the same supervisor to whom plaintiff reported nor that she was subject to the same set of standards as plaintiff).

In Martin, the plaintiff failed to establish a prima facie case of either race or religious discrimination because he did not provide any individual comparator from a non-protected class that was similarly situated to him.  Martin, 2003 U.S. Dist. LEXIS 1191, at *17, 19.  The employees with whom he compared himself who were promoted over him were all employed at different locations, subject to different supervisors employing different management decisions. Id. at *17.  Moreover, the plaintiff in Martin failed to make a prima facie showing that he was treated differently than the other two employees, both white, with respect to training.  Id. at *14. Specifically, the evidence revealed that none of the employees under the plaintiff's supervisor were trained, including the two white employees with whom he worked.  Id. at *13.

In this case, Druker alleges religious discrimination based upon her perception that other support staff in the Center with whom she worked, specifically Ms. Shepherd, Ms. Wilson and Ms. Montanti, were treated more favorably than she was.  For example, Druker claims that Dr. Turner required her to submit more evidence of illness to obtain sick time off than other non-Jewish employees of the Center were required to do (Exhibit 48, Complaint, ¶ 22; Druker Log, Exhibit 9, see 10128, 10145), that non-Jewish employees were given more leeway to attend to personal matters than Dr. Turner gave her (Exhibit 48, Complaint, ¶ 23; Druker Log, Exhibit 9, see 10023, 10024, 10129), that other employees were not required to make-up lost work time, like Dr. Turner required of her (Druker Log, Exhibit 9, see 10023, 10024, 10130, 10114), and

that Dr. Turner closely watches her time, but other non-Jewish employees are not closely

monitored as to time (Exhibit 48, Complaint, ¶ 24; Druker Log, Exhibit 9, see 10034, 10044,

10067, 10068, 10070, 10077, 10084, 10087, 10090, 10092, 10093, 10100).

Druker admits that Ms. Shepherd, Ms. Wilson and Ms. Montanti did not report directly to

Dr. Turner and were not subject to her standards.  (Druker Dep. at 109-10, 114).  Accordingly,

Druker cannot point to them to satisfy the fourth prong of prima facie case of discrimination.

Because Druker cannot identify any similarly situated employee who is not Jewish and

who was treated more favorably, she cannot establish a prima facie case of religious

discrimination.  Thus, Druker's Title VII claims of discrimination and retaliation (based on all

events prior to her discharge/denial of transfer) in Count I of the Complaint must be dismissed.

> **C.**     **Druker's claim of a religiously hostile work environment under Title VII must be dismissed because the alleged religious harassment was not severe or pervasive**

Druker claims that she was subjected to a religiously hostile work environment when she

worked in the Center in violation of Title VII.  (Complaint, Count II).  The record reflects that

even if Druker's version of highly disputed facts is fully credited, Dr. Turner and Druker's co-

workers made a handful of arguably inappropriate statements occurring sporadically over her

three years of employment in the Center.

In order to establish a hostile work environment claim under Title VII, Druker must show

that:  (1) she suffered intentional discrimination because of her religion; (2) the discrimination

was pervasive and regular; (3) the discrimination detrimentally affected the Druker; (4) the

discrimination would detrimentally affect a reasonable person of the same religion in that

position; and (5) a basis for vicarious liability.  Kunin v. Sears Roebuck and Co., 175 F.3d 289,

293 (3d Cir. 1999), cert. denied, 528 U.S. 964 (1999); Andrews v. City of Philadelphia, 895 F.2d

1469, 1482 (3d Cir. 1990).

Druker cannot establish the second element because the alleged religious harassment was neither pervasive nor regular.  A plaintiff pursuing a hostile work environment claim must show that the workplace was "permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the [employee's] employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citations omitted).  The Third Circuit has defined "pervasive harassment" as "that which occurs regularly or when incidents are in concert with one another."  Kay v. Independence Blue Cross, C.A. No. 02-3157, 2003 U.S. Dist. LEXIS 8521, at *19 (E.D. Pa. May 16, 2003) (citing Andrews, 895 F.2d at 1484).  In order for harassment to rise to this level, it must alter the conditions of employment and create an abusive working environment.  Id.

In determining the existence of a hostile work environment, the totality of the circumstances must be examined.  Martin, 2003 U.S. Dist. LEXIS 1191, at *21.  Therefore, a court should consider such factors as frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998); Harris, 510 U.S. at 23.  For example, in Martin, the Eastern District of Pennsylvania held that the plaintiff could not demonstrate a prima facie case of a hostile work environment claim, in part, because the handful of comments proffered by the plaintiff did not constitute "pervasive or regular" discrimination as they were isolated incidents. Martin, 2003 U.S. Dist. LEXIS 1191, at *22.

In granting summary judgment for the employer on the hostile work environment claim brought by the plaintiff in Kay v. Independence Blue Cross, the Eastern District of Pennsylvania focused on the fact that the conduct at issue occurred infrequently.  Kay, 2003 U.S. Dist. LEXIS

8521, at *21.  Specifically, the plaintiff's claim was based on four pieces of offensive mail, three instances of derogatory comments made by co-workers, and a number of offensive anonymous voice mail messages all occurring during a time period of two and one half years.  Id.  The court found that the infrequency of the discriminatory conduct weighed heavily against the plaintiff. Id.; see also Ogden, 226 F. Supp. 2d at 598 (holding that a reasonable jury could not find that the infrequent and isolated comments complained of constituted pervasive or regular harassment); Gharzouzi v. Northwestern Human Servs. of Pennsylvania, 225 F. Supp. 2d 514, 536 (E.D. Pa. 2002) (holding that because the incidents complained of were not ongoing, but only occurred six times over a three month period, the plaintiff failed to satisfy the regular and pervasive requirements).

In this case, the incidents of religious harassment alleged by Druker occurred sporadically over Druker's three years of employment in the Center.  As Druker admits, she was not subjected to religious discrimination from her co-workers for the first year and a half of her employment in the Center.  (Druker Dep. at 119).  Druker admitted in her first deposition that none of her co-workers used a religious epithet during her employment at the Center.  (Druker Dep. at 127-28).[17]  In fact, Druker never complained to Dr. Turner about religious discrimination on the part of her co-workers.  (Druker Dep. at 134).  Druker characterizes Wilson's one comment asking her what religion she is and Shepherd's one comment about whether a certain phrase used by Druker was a Jewish phrase as inappropriate comments and not discrimination. The incident involving Wilson putting proselytizing material in Druker's mailbox, which is not discrimination, occurred only one time.  (Druker Dep. at 134-38).  Druker's claim of religious

---

[17]    In a later deposition, Druker recalled an incident of overhearing a clerical co-worker use the words "fucking Jew" on the telephone in a context which made Druker believe she was the subject.  (Druker Dep. at 219-21).  This one undocumented incident is not enough to change the result.

discrimination as to her co-workers is "more the way that [she] was treated." (Druker Dep. at 127-28).

As for discrimination by Dr. Turner, the record evidence reflects that the alleged incidents of harassment by Dr. Turner involved a one-time delay in authorizing leave to observe Yom Kippur, one-time asking whether she had any more Jewish holidays, the cancellation of a vacation because "Santa" wasn't coming to Druker's house and a request that Druker work on one Saturday to complete a grant application. These incidents fail to satisfy the regular or pervasive requirement.

Druker's allegations of religious harassment are not sufficiently severe to constitute a hostile work environment. Dr. Turner's reference to her religion, which is the reason Druker was offended by the Santa Claus comment, and asking Druker whether she has any more Jewish holidays is not discrimination, let alone sufficiently severe to constitute religious harassment. Moreover, Druker admits that Dr. Turner never denied her the right to take off a Jewish holiday. (Druker Dep. at 27). Druker does not allege that Dr. Turner used any religious epithets.

At most, Druker may have been subjected to offhand comments about her religion and non-serious isolated incidents that do not constitute discriminatory changes in the terms and conditions of employment and, therefore, are insufficient to establish an issue of material fact. Shramban v. Aetna, 262 F. Supp. 2d 531 (E.D. Pa. 2003) (granting summary judgment for defendant on plaintiff's religiously hostile work environment claim because plaintiff failed to satisfy the pervasive and regular requirement where the alleged discriminatory conduct and comments, including improper personal comments and mimicking plaintiff's accent, spanned a

period of just over one year and were not sufficiently severe to alter the conditions of employment). Accordingly, Druker's hostile work environment claims must be dismissed.[18]

**D.     Druker cannot establish a prima facie case of retaliation or that Defendants' legitimate, non-retaliatory reasons for her termination or failure to be transferred to an alternative position at TJU are pretextual**

Druker's termination and related denial of a new position at TJU after Dr. Turner left is the one and only adverse action which Druker suffered at TJU as well as the one and only Title VII claim timely filed after receipt of a right to sue letter.

With respect to Druker's retaliatory termination claim, Druker cannot seriously dispute the fact that her position at the Center was eliminated for a manifestly non-discriminatory reason - Dr. Turner's departure. (Exhibit 18, Bowie Affidavit ¶ 3; Exhibit 41).

The issue for the Court is whether Dr. Turner's alleged <u>threat</u> to Druker (vigorously denied by Dr. Turner) that she would prevent Druker from getting another job elsewhere at TJU after Druker complained to Dr. Merli about her is sufficient to create a jury question about whether Dr. Turner carried out the threat and caused Druker's failure to receive an offer of an alternative position.

TJU's unrebutted evidence that none of the alleged decision-makers made their decision to reject Druker for a position based on negative information from Dr. Turner makes it impossible for Druker to carry her burden of demonstrating a causal link between her protected activity and the adverse action.

While the timing of an adverse employment action in relation to protected activity may <u>suggest</u> a causal connection, <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 501 (3d Cir. 1991), timing

---

[18]     In Counts I and II, Druker asserts Title VII claims against Dr. Turner individually. The law is clear that individual employees cannot be held personally liable under Title VII. <u>Sheridan v. E.I. Dupont DeMours & Co.</u>, 100 F.3d 1061, 1078 (3d Cir. 1996), *cert, denied*, 117 S. Ct. 2532 (1997).

alone is not sufficient to establish a causal connection between protected activity and an adverse

employment action in the absence of "unusually suggestive" facts.  See Krouse v. American

Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997) (affirming summary judgment for employer on

plaintiff's retaliation claim stating that temporal proximity alone is insufficient to establish the

necessary causal connection when the temporal relationship is not "unusually suggestive");

Robinson, 120 F.3d at 1302 (timing alone is insufficient to prove a causal connection in the

absence of unusually suggestive facts); Delli Santi v. CNA Ins. Co., 88 F.3d 192, 199 n.10 (3d

Cir. 1996) ("timing alone will not suffice to prove retaliatory motive").

        The record in this case does not reflect the kind of "unusually suggestive" facts identified

by the Third Circuit as sufficient to warrant an inference of causation from timing alone.  For

example, in Jalil v. Avdel Corp., 873 F.2d 701, 708-09 (3d Cir. 1989), *cert. denied*, 493 U.S.

1023 (1990), the court found "unusually suggestive" facts where the plaintiff was terminated just

two days after the employer learned about plaintiff's EEOC claim and where the facts leading up

to plaintiff's termination suggested that the employer was trying to induce plaintiff's

insubordination as a pretext for firing him.

        Not only are there no unusually suggestive facts which would warrant an inference of

causation in this case, but also none of the people identified by Druker as those she submitted an

application to or interviewed with to find an alternate position were aware that Druker had

complained about discrimination during her employment at TJU.  Specifically, Smith,

Falkowski, Dr. Goldstein, Scully, Pownall, Dr. Boman, Gallagher and Dr. Myers each testified

that they were not aware Druker had complained about discrimination during her employment at

TJU.  (Exhibit 33, Smith Affidavit ¶ 4; Exhibit 34, Falkowski Affidavit ¶ 6; Exhibit 35,

Goldstein Affidavit ¶ 4; Exhibit 37, Scully Affidavit ¶ 4; Exhibit 36, Pownall Affidavit ¶ 5;

Exhibit 21, Boman Affidavit ¶ 5; Exhibit 38, Gallagher Affidavit ¶ 5; Exhibit 39, Myers Affidavit ¶ 4).  In fact, Druker admits that she never told anyone with whom she interviewed for an alternate position about her complaint of discrimination.  (Druker Dep. at 208-09).

The party allegedly responsible for the adverse conduct must be aware of the plaintiff's protected activity before causation can be inferred.  See Jones, 198 F.3d at 415 (affirming district court's dismissal of plaintiff's retaliation claim because plaintiff produced no evidence that the people who allegedly took the adverse action knew plaintiff had engaged in protected activity).

Druker admitted she has no evidence that Dr. Turner had anything to do with her failure to be interviewed or receive a job offer from the Department of Radiology, Department of Psychiatry/Smith, Department of Pediatrics, Schecter, Falkowski/Department of Endocrinology, Dr. Goldstein, or Scully/Pownall/Sponsored Programs Accounting, .  (Druker Dep. at 377-393, 400-404).  In contrast to Druker's lack of specific facts supporting Dr. Turner's interference with her employment search, each of these people denied having any communication with Dr. Turner about hiring Druker.  (Exhibit 33, Smith Affidavit ¶ 3; Exhibit 34, Falkowski Affidavit ¶ 5; Exhibit 35, Goldstein Affidavit ¶ 3; Exhibit 37, Scully Affidavit ¶ 3; Exhibit 36, Pownall Affidavit ¶ 4; Exhibit 38, Gallagher Affidavit ¶ 4).

Druker undoubtedly will point to her conversation with Dr. Merli in which Dr. Merli mentioned an upcoming position with Dr. Capizzi and Dr. Turner's alleged statement that "that avenue is closed" as evidence of retaliation.  However, this does not create a genuine issue of material fact because it is undisputed that the position Dr. Merli mentioned was not created, and therefore anything allegedly said or done could not have had an impact.  Simply put, Dr. Turner could not have interfered with Druker's ability to be transferred to a position that did not exist. Dr. Merli testified that he and Dr. Capizzi had discussed "the possibility of developing a research

office within the Department of Medicine that would handle clinical trials and process the paperwork." (Merli Dep. at 18). In his meeting with Druker, he mentioned that "the Department of Medicine may be developing a position for a clinical research coordinator to put together grants and see them through internal institutional review board . . . it was not a created job. It was discussed in a chairman's meeting as a direction Dr. Capizzi was thinking of taking in 1999." (Merli Dep. at 18-19). Dr. Merli testified that the position itself was never created. (Merli Dep. at 20).

Even Druker's testimony reflects that Dr. Merli told Druker the position was not yet created. Druker testified that Dr. Merli said: "there was a job coming up with a brand new project being put together by Dr. Capizzi, who was at the time the Chairman of the department; that this would be a research center, it looked like it was going to be well-funded . . . ." (Druker Dep. at 179) (emphasis added). Druker testified that she was unsure whether the position had already been authorized or was in the planning stage, but stated it was her "impression" that they were "looking for this particular type of person for this particular project that's coming up with Dr. Capizzi." (Druker Dep. at 322) (emphasis added).

There can be no genuine issue of material fact regarding whether Dr. Turner interfered with Druker's efforts to obtain a position with Dr. Capizzi if the position with Dr. Capizzi did not exist. See Griffith v. Colorado, Div. of Youth Services, 17 F.3d 1323, 1331 (10th Cir. 1994) (affirming grant of summary judgment on retaliation claim where no positions available for plaintiff or any other employee because of hiring freeze); Gomez v. City of Edgewater, No. 99-1113, 2000 U.S. App. LEXIS 5983, * 6-8 (10th Cir. Mar. 31, 2000) (affirming grant of summary judgment on plaintiff's discrimination claim for failure to hire because evidence established that no vacancies existed for plaintiff so he was not rejected for employment); Curran v. SEPTA,

C.A. No. 98-CV-134, 1999 U.S. Dist. LEXIS 521, *8-9 (E.D. Pa. Jan. 21, 1999) (granting summary judgment to employer on § 1983 retaliation claim alleging failure to promote to sergeant where no evidence that a sergeant's position was available) *aff'd without opinion*, 191 F.3d 444 (3d Cir. 1999).

Because Druker has no evidence of a causal connection between her protected activity and her failure to be interviewed or hired for another position at TJU, her retaliation claim relating to her transfer to an alternate position at TJU fails as a matter of law.

Even if the Court finds that Druker established a prima facie case of retaliation, the Court is left with Druker's supposition that Dr. Turner "blackballed" her at TJU in the face of overwhelming, unrebutted evidence that Druker was rejected for legitimate non-discriminatory reasons by a large group of individual decision-makers.

Each of the people identified by Druker as those she submitted an application to or interviewed with to find an alternate position have given a legitimate, non-retaliatory reason for their decision not to interview or hire Druker. For example, Gallagher and Pownall each concluded that Druker was not qualified for the position. (Exhibit 38, Gallagher Affidavit ¶ 3; Exhibit 36, Pownall Affidavit ¶ 3). Dr. Goldstein, Gallagher and Falkowski each concluded that Druker's personality was not a good fit for the position. (Exhibit 35, Goldstein Affidavit ¶ 2; Exhibit 38, Gallagher Affidavit ¶ 3; Exhibit 34, Falkowski Affidavit ¶ 4). Smith had already made an offer to another candidate. (Exhibit 33, Smith Affidavit ¶ 2). Druker cannot identify any evidence in the record to call into question any of these legitimate, non-retaliatory reasons for their decision not to interview or hire her.

To avoid summary judgment, Druker's evidence rebutting the TJU's proffered legitimate reason for her termination must allow a factfinder reasonably to infer that the proffered non-

discriminatory reason "was either a post hoc fabrication or otherwise did not actually motivate the employment action." Fuentes, 32 F.3d 759, 764 (3d Cir. 1994). "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." Id. at 765. Rather, the plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence." Id. (citing Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992), cert. denied, 510 U.S. 826 (1993)). Druker's supposition, even when augmented by the alleged threat by Dr. Turner, is insufficient evidence of pretext.

Because Druker cannot establish a genuine issue of material fact that the reasons given for Druker's inability to find an alternative position at TJU was a pretext for retaliation, her retaliation claim relating to her transfer to an alternate position at TJU fails as a matter of law.

**E.    Defendants are entitled to summary judgment on all of Druker's PHRA claims**

   **1.    Druker's retaliation claims under the PHRA relating to her termination and denial of transfer to another position are time barred because Druker failed to file a charge within 180 days of the alleged retaliation**

Druker's PHRA claim that TJU and Dr. Turner retaliated against her by terminating her employment and interfering with her efforts to transfer to another position at TJU in violation of the PHRA. (Complaint, Count III), is time-barred.

The PHRA requires the filing of a Complaint within 180 days of the alleged discriminatory action. 43 Pa. C.S. § § 959(a), 962 (2003). This 180-day period is strictly enforced, and courts have repeatedly held that "persons with claims that are cognizable under the

Human Relations Act must avail themselves of the administrative process of the Commission or

be barred from the judicial remedies authorized in section 12(c) of the Act." <u>Vincent v. Fuller</u>

<u>Co.</u>, 616 A.2d 969, 974 (Pa. 1992); <u>see also</u> <u>White v. Gallagher Bassett Services</u>, C.A. No. 02-

2364, 2003 U.S. Dist. LEXIS 2051, at *12-13 (E.D. Pa. Feb. 4, 2003) (plaintiff missed the filing

period by only four days, but the court dismissed her claim); <u>Richardson v. Miller</u>, 446 F.2d

1247, 1248 (3d Cir. 1971) ("Since plaintiff failed to file a charge with the respective

Commissions within the appropriate time periods, he is now foreclosed from pursuing the

remedies provided by the Acts."); <u>see generally</u> <u>Woodson</u>, 109 F.3d at 925 ("*Strictly interpreting*

the filing requirement of the PHRA allows the PHRC to use its specialized expertise to attempt

to resolve discrimination claims without the parties resorting to court.") (emphasis added).

Druker's administrative charge for retaliation relating to her termination and inability to

transfer to another position was filed with the EEOC on September 7, 2000.  (Exhibit 42).  This

charge was filed 245 days after December 31, 1999, which is the last day of Druker's

employment at TJU and the latest possible date of retaliation.  Because the 180-day period is

strictly enforced, <u>Vincent</u>, 616 A.2d at 974, Druker's retaliation claims under the PHRA in Count

III of the Complaint are time-barred and must be dismissed.

> **2.     The Title VII deficiencies in Druker's discrimination, harassment and hostile work environment apply to her parallel PHRA claims**

Counts III and IV simply repeat Druker's Title VII claims, asserting a violation of the

PHRA.  The PHRA is interpreted consistent with Title VII.  <u>Goosby v. Johnson & Johnson</u>

<u>Medical, Inc.</u>, 228 F.3d 313, 317 n.3 (3d Cir. 2000) (construing the PHRA in accordance with

interpretations of Title VII); <u>Jones</u>, 198 F.3d at 409 (same); <u>Knabe v. Boury Corp.</u>, 114 F.3d 407,

410 n.5 (3d Cir. 1997) (same).

As reflected in Sections V(B), V(C) and V(D) above, Druker (1) cannot establish that she suffered an adverse employment action prior to her discharge; (2) cannot show a similarly situated individual who is not Jewish was treated more favorably by TJU/Dr. Turner, and (3) was not subject to a hostile work environment. Accordingly, Druker cannot establish a violation of the PHRA based on these same allegations. Accordingly, Counts III and IV of the Complaint must be dismissed.[19]

### F.    Druker's claim of negligent supervision is barred

In Count VI of the Complaint, Druker asserts a claim of negligent supervision. This claim is barred by the exclusivity provision of the Pennsylvania Workers Compensation Act (WCA) which provides the exclusive remedy for employees' work related injuries. Schick v. Shirey, 716 A.2d 1231, 1237 (Pa. 1998). This provision states: "The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employees . . . ." 77 Pa. Con. Stat. Ann. § 3481(a).

Druker's negligent supervision claim falls squarely within this exclusivity provision and must be dismissed. Hettler v. Zany Brainy, Inc., Civ. A. No. 99-3879, 2000 WL 1468550, at *5-7 (E.D. Pa. Sept. 27, 2000) (dismissing plaintiff's negligence claims pursuant to the WCA which provides the exclusive remedy for employee's work-related injuries); O'Donnell v. R.M.S. Shoemaker & Co., 816 A.2d 1159, 1161-1164 (Pa. Super. 2003) (affirming trial court's grant of

---

[19]    In Counts III and IV of the Complaint, Druker asserts that Dr. Turner is individually liable under the PHRA based on Dr. Turner's alleged discriminatory conduct. The law is clear that individual liability under the PHRA is limited to liability for aiding and abetting in discrimination. 43 Pa. Cons. Stat. Ann. § 955(c). Because Druker claims Dr. Turner directly engaged in acts of discrimination, Dr. Turner is not liable as an aider and abettor, and she must be dismissed from Counts III and IV as a matter of law. See Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552-53 (3d Cir. 1996) (dismissing individual defendant where plaintiff alleged no facts that he aided and abetted plaintiff's employer discrimination, but rather only direct incidents of harassment).

summary judgment to defendants on plaintiff's negligence claims because the WCA provides

plaintiff's exclusive remedy for work related injuries), *appeal denied*, No. 111 EAL 2003, 2003

Pa. LEXIS 1130 (Pa. June 27, 2003); Layne v. Foxchase Career Ctr., 36 Pa. D&C 4th 212 (Ct.

Comm. Pl. 1996) (dismissing plaintiff's negligence claims as barred by the exclusivity provision

under the WCA).

     **G.**      **Druker's allegations of defamation are time-barred and are not actionable**

     In Count VII of the Complaint, Druker asserts a claim of defamation.  In support of her

defamation claim, Druker testified in her deposition that Dr. Turner made the following

defamatory statements:

    1.     Dr. Turner told Druker that she was stupid and that Druker had "screwed up all of her grants and her work and her papers."  (Druker Dep. at 356).

    2.     Dr. Turner told Druker that she was too stupid to control her own cough. (Druker Dep. at 357-58).

    3.     Dr. Turner accused Druker of being responsible for the IRB report being returned to her for clarification.  (Druker Dep. at 359).

    4.     Dr. Turner told Druker that she looked like Bozo the Clown.  (Druker Dep. at 362).

    5.     Dr. Turner told a vendor that Druker had "screwed up all of her work," and that "she couldn't find the translations,"(Druker Dep. at 366-67), which Druker alleges that she gave to Dr. Turner.  (Druker Dep. at 366).

    Druker's defamation claim is time-barred because all of these alleged defamatory

statements were made more than one year before she filed her defamation claim.  Pennsylvania

applies a one-year statute of limitations to defamation actions.  42 Pa. C.S. § 5523 (2003).

Druker admits that all of the above comments, except that reflected in number 5 above allegedly

made to the vendor, were made during the course of her employment with TJU.  (Druker Dep. at

356-65).  Therefore, the statements reflected in number 1-5 had to have been made on or before

December 31, 1999, when Druker's employment with TJU was terminated. Druker initiated this lawsuit by writ of summons on January 29, 2002 which is two years after her employment at TJU ended. As a result, Druker's defamation claim, as to those comments made during her employment, is time-barred. See Schwartz v. Kunz, et al., C. A. No. 98-4224-KAJ, 2003 U.S. Dist. LEXIS 7716, at *18 (E.D. Pa. Apr. 14, 2003) (majority of plaintiff's claims of defamation barred by one year statute of limitations for defamation actions).

The only comment that could possibly survive the statute of limitations is the comment allegedly made to the vendor, since Druker alleges that it was made after her employment with TJU ended. (Druker Dep. at 365-67). However, Druker cannot recall when this comment was made. (Druker Dep. at 365-67). Thus, Druker has no evidence that the comment was made within the one year statute of limitations (within one year prior to January 29, 2002 when she initiated this lawsuit or after January 29, 2001). Because Druker has the burden of presenting specific, concrete evidence to support her claim and may not rely on unsupported assertions or conclusory allegations to avoid summary judgment, Druker's defamation claim as to the vendor comment must also be dismissed.

Even if the vendor comment is not dismissed on this basis, Druker's defamation claim still fails because the comment was not defamatory. In Pennsylvania, a plaintiff has the burden of proving the following elements to sustain a claim for defamation: (1) the defamatory character of the communication; (2) its publication by the Defendant; (3) its application to the Druker; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the Druker; (6) special harm resulting to the Druker from its publication; and (7) abuse of a conditionally privileged occasion.

42 Pa. C.S. § 8343(a) (2003); Barclay v. Keystone Shipping Co., 128 F. Supp. 2d 237, 246-47
(E.D. Pa. 2001). Druker fails to meet this burden.

A defamatory statement is one that tends to harm the reputation of another as to lower the
community's view of the individual or to deter third persons from associating or dealing with her.
Puchalski v. School District of Springfield, 161 F. Supp. 2d 395, 407 (E.D. Pa. 2001) (citing U.S.
Healthcare, Inc. v. Blue Cross of Greater Philadelphia, 898 F.2d 914, 923 (3d Cir. 1990), *cert
denied*, 498 U.S. 816 (1990)). A communication is defamatory if it ascribes to another's
conduct, character or a condition that would adversely affect her fitness for her business, trade or
profession. Puchalski, 161 F. Supp. 2d at 407 (citing Maier v. Maretti, 671 A.2d 701 (Pa. Super.
1995), *appeal denied*, 694 A.2d 622 (Pa. 1997)).

The record is devoid of any evidence that Druker was adversely affected by the statement
that Dr. Turner allegedly made to the vendor. In fact, even if it is assumed that the comment was
made, it is clear that the vendor was still associating with Druker afterwards. Accordingly,
Druker's reputation was not adversely affected by Dr. Turner's statement and Druker has not
suffered any other harm. See Walker v. Grand Central Sanitation, 634 A.2d 237, 241-42 (Pa.
Super. 1993), *appeal denied*, 651 A.2d 539 (Pa. 1994).

In addition, statements of opinion, without more, are not actionable defamation. Mathias
v. Carpenter, 587 A.2d 1, 3 (Pa. Super. 1991), *appeal denied*, 602 A.2d 860 (Pa. 1992). Dr.
Turner's statement to the vendor that Druker "screwed up all of her work," cannot be
characterized as defamatory, but merely Dr. Turner's opinion of Druker's work. See Walker, 634
A.2d at 240-241 (finding statements such as, "the employer 'did not have a lot of success with'
the plaintiff" to a future employer, to be opinions only, and therefore, not defamatory). Whether
a particular statement constitutes a fact or an opinion is a question of law for the trial court to

determine.  Mathias, 587 A.2d at 3.  "A defamatory communication may consist of a statement in

the form of an opinion, but a statement of this nature is actionable only if it implies the allegation

of undisclosed defamatory facts as the bases for the opinion."  Id.  Here, Dr. Turner disclosed the

fact that she could not find the translations that Druker had allegedly given to her, which

prompted her to tell the vendor that Druker had screwed up her work.  Because Dr. Turner

disclosed the specific fact that she based her opinion on to the vendor, the statement is not

actionable.  See id. at 4 (finding that a description of a photograph in a newspaper article did not

have a defamatory meaning, but was merely an opinion because the newspaper article disclosed

all of the facts upon which the author based his opinion).

        Finally, the only evidence of this alleged defamatory comment to the vendor is

inadmissible hearsay.  During her deposition, Druker claimed that Dr. Turner made the statement

to the vendor, and that the vendor then told Druker about the comment.  (Druker Dep. at 366-67).

The vendor's statement to Druker is hearsay, and therefore, is inadmissible.  Fed. R. Evid.

801(c).  "In considering a summary judgment motion the court may rely only on evidence

admissible at trial . . . and may not consider hearsay evidence."  Beyda v. USAir, Inc., et al., 697

F. Supp. 1394 (W.D. Pa. 1988) (granting summary judgment to employer because Druker's only

evidence of defamation was hearsay); see also Cagna v. Weirton Steel Corp. Retirement Plan, et

al., No. 02-2547, 2003 U.S. App. LEXIS 12886, at *7, n. 1 (3d Cir. June 23, 2003) (finding that

hearsay evidence does not create a genuine issue at the summary judgment stage); Synygy, Inc.

v. Scott-Levin, Inc., et al., 51 F. Supp. 2d 570, 576 (E.D. Pa. 1999) (granting summary judgment

on defamation claim because only evidence Druker offered was hearsay), aff'd without opinion,

229 F.3d 1139 (3d Cir. 2000).  Because the only evidence of Dr. Turner's comment to the vendor

is hearsay, the comment is inadmissible and cannot create a genuine issue of fact as to Druker's defamation claim.  Accordingly, the defamation claim should be dismissed.

## VI.      <u>CONCLUSION</u>

For the foregoing reasons, Defendants request that their Motion for Summary Judgment be granted and that Druker's Complaint be dismissed in its entirety.

<div style="margin-left:45%;">

_____
Robert M. Goldich, Esquire, #25559
Caroline M. Austin, Esquire, #75228
WOLF, BLOCK, SCHORR and SOLIS-COHEN LLP
1650 Arch Street - 22nd Floor
Philadelphia, PA 19103-2097
(215) 977-2152/2336

Attorneys for Defendants

</div>

Dated:  September 12, 2003

## <u>CERTIFICATE OF SERVICE</u>

I, Robert M. Goldich, hereby certify that on September 12, 2003, I caused a true and

correct copy of the foregoing Defendants' Memorandum of Law in Support of the Motion for

Summary Judgment to be served via first class mail, postage pre-paid to the following:


        William H. Ewing, Esquire
        Eckert Seamans Cherin & Mellott, LLC
        1515 Market Street, 9th Floor
        Philadelphia, PA 19102


                                _____
                                Robert M. Goldich, Esquire

DSB:920679.7/JEF023-159109