**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SONDRA G. DRUKER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CIVIL ACTION |
| THOMAS JEFFERSON UNIVERSITY | : | |
| | : | NO. 02-CV-2692 |
| and | : | |
| | : | |
| BARBARA J. TURNER, M.D., | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S BRIEF OPPOSING MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sondra G. Druker filed this action against Thomas Jefferson University ("TJU"), seeking a remedy for the discrimination, harassment and retaliation she suffered on account of her Jewish religion while working under the supervision of Dr. Barbara J. Turner, Director, Division of Health Care Research of the Center for Research in Medical Education and Health Care (the "Center").

This case is a classic credibility dispute which must be submitted to the jury for resolution. Sondra Druker claims that she was exposed to persistent differential treatment and harassment because she was an observant Jew but, nevertheless, she provided exemplary service and effectively performed both a professional and clerical job at the insistence of her boss, Dr. Turner. She claims that she complained repeatedly about discrimination based on her religion, including no fewer than nine (9) separate letters and written memoranda. She says that those complaints led to increased harassment and discrimination, leading ultimately to a refusal to provide her with any other employment when Dr. Turner left TJU.

Respondents deny ever receiving any written complaint of discrimination or harassment, and they assert that the oral complaints they received from Ms. Druker did not allege discrimination.  Further, they claim that Ms. Druker asked TJU not to take any action on those complaints. TJU absolutely denies being aware of any religious slurs or discrimination except swasikas that appeared on a public elevator, as to which they threw up their hands and professed themselves unable to do anything.  Defendants take the position that Ms. Druker was just a disgruntled employee who could not get along with anyone else in the workplace.  Finally, their explanations for TJU's failure to offer Ms. Druker any other job when Dr. Turner left there leave large gaps and are in important respects inconsistent with what Ms. Druker was told at the time or with the evidence of Ms. Druker's talents and abilities.

## I.    FACTS

Rather than attempt to create a narrative from bits and pieces of deposition testimony, much of which was incomplete because of the nature of the question and answer process when opposing counsel is asking the questions, plaintiff is filing with this brief a Declaration of Sondra G. Druker and Exhibits thereto, which provides a mostly chronological statement of the testimony that Ms. Druker will give about what happened during her employment in the Center for Research in Medical Education and Health Care at Thomas Jefferson University, and supporting documentation.  That Declaration is cited hereinafter as "Druker Dec."  This statement of facts will not repeat the Declaration but will simply highlight a few details, point out other evidence in the record, and comment on some of the distortions which appear in defendants' statement of facts.  Plaintiff notes that defendants' brief is sprinkled liberally with evidence which defendants say they will adduce to dispute plaintiff's evidence.  Of course, that evidence is not relevant on this motion for summary judgment because the evidence

must be considered "in the light most favorable to the plaintiff."  *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 267 (3d Cir. 2001).

   Even before she began to work at the Center, Ms. Druker had experienced religious discrimination at TJU.  She started there as a temporary employee.  One of her assignments was in the Office of University Counsel, where Alan B. Kelly, Esquire, had just begun to serve as University Counsel.  While speaking with the office manager, she overheard Mr. Kelly tell someone on the telephone "that he had been brought onboard, I believe he said, to solve the Jewish situation or to resolve the Jewish situation."  Druker dep. 6/23/03, p. 443. [1] After that, Ms. Druker worked as a clerical employee in the Department of Pathology, where she started as a temporary employee and later became permanent.  While working there, she was subjected to sexual harassment and other abuse by a physician to whom she was assigned, Dr. Bruce Fenderson, who also insulted her on the basis of her religion, calling her at one time "a cheap Jew."  Druker dep. 3/25/03, p. 49.  Because she otherwise enjoyed her work in the Department of Pathology, *id.*, p. 52, she spoke with numerous persons in authority seeking a remedy that would enable her to continue to work there without being subjected to harassment.  *Id.*, pp. 49-68.  Ultimately, Dr. Fenderson's conduct forced her to leave the Pathology Department.  *Id.*, p. 66.  Dr. Fenderson continued to stalk her even after that, and she was forced to obtain intervention by the head of employee relations to eventually put a stop to that conduct.  *Id.*, pp. 97-101.[2]

---

[1]   Relevant excerpts from Ms. Druker's deposition are attached hereto and marked as Exhibit 3.

[2]   It is certainly not accurate for defendants to say that Ms. Druker was "satisfied with TJU's remedial efforts" with respect to Dr. Fenderson.  Defendants' Brief at 4.  The testimony cited above makes clear that TJU's so-called "remedial efforts" were neither prompt nor completely effective, so she was forced to change jobs and then seek additional intervention in order to escape Dr. Fenderson's unwelcome attentions.

Ms. Druker left Pathology to transfer to the Center.  As soon as she started there, two of her co-workers took pains to ask her about her religious beliefs.  Theresa Wilson asked her, "You are Jewish, aren't you?"  Ellen Shepherd, administrative assistant to the Director of the Center, said, "I heard you are Jewish."  Druker dep. 3/25/03, p. 115.  Later, Ms. Druker learned that Ms. Shepherd had telephoned a mutual friend ahead of time to find out about Ms. Druker and had been very disappointed to learn that Ms. Druker was Jewish and not a "sister."  Druker dep. 5/8/03, pp. 195-96.  From that time on, Ms. Druker was repeatedly subjected to harassment and other discriminatory treatment motivated by her religion.  As a result, she suffered substantial health problems and mental suffering leading to a crisis in her faith because she could not understand why God would make her go through such horrible things.  Druker dep. 3/25/03, p. 21,  She reduced her religious observance, including prayers, and engaged in activities such as shopping on the Sabbath.[3]  *Id.*, pp. 20-21.  Those effects of her treatment by TJU continue to the present.  *Id.*, p. 29.

When Ms. Druker had been working at the Center for about a year, she boarded the elevator one morning to be confronted with a poster which had been defaced with swastikas.  She reported that promptly to the Security Department and to Human Resources, as well as Dr. Turner, but she was never informed of any investigation or other action to track down the offender.  TJU apparently just threw up its hands and gave up on the possibility of discovering the culprit.  Druker Dec. ¶ 4.

Both professional and non-professional employees of the Center who were not Jewish consistently received more favorable treatment than Ms. Druker.  Ms. Druker's hours

---

[3]      It is appalling that defendants take advantage of the harm they have done to Ms. Druker's religious faith in order to cast aspersions on it.  They say that "the <u>only</u> activity Druker avoids on the Sabbath is working."  Defendants' Brief at 11.  Much of what they say there is based on conduct that results from the crisis of faith that Ms. Druker suffered as a result of the hostility she suffered at TJU.  Druker dep., pp. 21-24.

were closely monitored by Dr. Turner, and she was not allowed to spend any time on personal matters, whereas Shepherd, Wilson, Montanti, and the professional employees who reported to Turner were all allowed to take long lunch hours, take courses during the work week, go shopping, and spend their time on other personal pursuits without any repercussions.  Alone among all the employees at the Center, Ms. Druker was required to present her boss, Dr. Turner, a list of everything she did every day and precise accounting of her arrival, lunch and departure times.  Druker Dec. ¶¶ 9, 12, 21 and Ex. C, D.

Dr. Turner first imposed this time-keeping requirement after Ms. Druker complained to Human Resources about the discrimination which she was suffering.  That came to a head in the fall of 1998, when Dr. Turner delayed until the last moment in approving Ms. Druker's day off on Yom Kippur.[4]  When Ms. Druker returned after the holy day, Dr. Turner asked her, "So, do you people have anymore god damned holidays, or what?"  Druker dep. 3/25/03, p. 147.  Ms. Druker informed her that Sukkoth was coming up, and Dr. Turner responded, "Yeah, well you don't have any more fuckin' time."  Druker Dec. ¶¶ 19, 20.  Shortly after that, Ms. Druker began to suffer severe physical problems as a result of the treatment she was receiving.  Druker Dec. ¶ 24.

As described at length in Ms. Druker's Declaration, the harassment and retaliation continued for the next year, climaxing in August 1999, when Dr. Turner hit her on the head in demanding her attention while she was on the telephone and shortly thereafter screamed obscenities and kicked a waste container at her.  Druker Dec. ¶ 42.  Repeated complaints to Dr. Turner herself and to Human Resources provided no relief.  Finally, in November 2003, she met

---

[4]    Contrary to Defendants' claims, Yom Kippur in 1998 started at sundown on **September** 29, not October 29.  See calendar excerpt attached hereto and marked as Exhibit 1.  The difference is crucial because October 29 falls in the middle of a sequence of events which can properly be understood only in the context that they arose in reaction to the issue raised by Dr. Turner's handling of Ms. Druker's religious observance at the end of September.

with Dr. Geno Merli, who supervised Dr. Turner with respect to her medical practice. Druker Dec. ¶ 45. That led to another series of retaliations by Dr. Turner, including her promise to close the door to a job opportunity which Dr. Merli had suggested, and her flat refusal to provide Ms. Druker with a letter of reference, even though it later developed that she had actually written one. Druker Dec. ¶¶ 46, 48, 49 and Ex. O, P. Dr. Merli confirmed to Ms. Druker the rumors she had heard that Dr. Turner was about to leave TJU and move to the University of Pennsylvania. As a result, Ms. Druker's job was scheduled for elimination. Ms. Druker shifted into high gear the search for another job at TJU which she had initiated earlier. Although she had been promised help by TJU's Human Resources office, they were of no help at all. Druker Dec. ¶¶ 51, 52. In addition, Dr. Turner refused to allow her to go to an interview during the workday, in contrast to her colleague Jim Cocroft, who was not Jewish and who had not complained of discrimination. Druker Dec. ¶ 48.

Working on her own, Ms. Druker submitted her resume for a number of appropriate positions and obtained interviews with several but was not hired in any. Druker Dec. ¶ 52; Defendants' Ex. 42; Druker dep. 6/23/03, pp. 370-404.

In December 1999 the stress resulting from discrimination and harassment got so bad that Ms. Druker had a serious flare up of gastrointestinal bleeding and was forced to take time off from work. Nevertheless, Dr. Turner insisted that she compose and complete complex Institutional Review Board forms for a grant which would not benefit TJU but which would fund her work at the University of Pennsylvania. Druker Dec. ¶¶ 54, 55.

As a result of the discrimination and harassment she suffered at TJU, Ms. Druker still continues to suffer from gastrointestinal problems, chest pains, severe headaches and depression. Druker Dec. ¶¶ 56, 57.

## II.  **PROCEDURAL HISTORY**

Ms. Druker filed her first charge of discrimination with the Equal Employment Opportunity Commission on June 4, 1999.  Defendants' Ex. 22.  That charge included allegations of religious discrimination and harassment, as well as retaliation for complaining of discrimination.  Ms. Druker asked that the charge be cross-filed with the Pennsylvania Human Relations Commission.  Ms. Druker asserts that she promptly notified the defendants that she had filed this charge.  Druker dep., pp. 294-97; Druker Dec. ¶ 37 and Ex. I.  Defendants claim that they did not receive notice of it until March 2000.  Defendants' Brief at 14.

On November 15, 1999, Ms. Druker filed an amended charge elaborating on the allegations contained in the original charge.  The charge was then given the identification number Charge No. 170A00890.  Defendants' Exhibit 24.

On September 7, 2000, after her employment had been terminated and she had despaired of finding another position at Thomas Jefferson University, Ms. Druker filed another charge with the EEOC (again requesting cross-filing with the PHRC), primarily asserting that defendants had retaliated against her by terminating her employment and not offering her another position when Dr. Turner left TJU, but also repeating her allegations of harassment and discrimination based on her Jewish religion.  That charge was identified as Charge No. 170A01829.  Defendants' Ex. 42.

On September 24, 2001, the EEOC issued its Determination of Charge No. 170A01829, finding "that the evidence obtained during the investigation establishes violations of Title VII based on retaliation when Charging Party was denied the opportunity to transfer to a

vacant position and was ultimately discharged after she complained of discrimination."  Exhibit 2 hereto.

The EEOC issued a right-to-sue letter for Charge No. 170A00890 on September 27, 2001.  Defendants' Ex. 44.  After its conciliation efforts had failed, the EEOC issued a right-to-sue letter for Charge No. 170A01829 on October 29, 2001.  Defendants' Ex. 46.

Ms. Druker commenced this action by writ of summons in Common Pleas Court on January 29, 2002.  Defendants' Ex. 47.  Subsequently, she filed a Complaint in Common Pleas Court, Defendants' Ex. 48, and defendants removed the action to this Court.

### III.   OUTLINE OF ARGUMENT

By and large, plaintiff's brief will follow the organizational structure of defendants' brief so that the Court can more easily find plaintiff's responses to defendants' arguments.  This Outline, however, is intended to respond to defendants' Motion by setting forth plaintiff's position on each count of the Complaint.

Defendants move for summary judgment on each of the seven (7) claims in the complaint.  Plaintiff's brief response on each claim is as follows:

1.      Plaintiff's Title VII claims of religious discrimination, religiously hostile work environment and retaliation are timely and appropriate under EEOC Charge No. 170A01829 regardless of whether her action pursuant to Charge No. 170A00980 was filed timely under Title VII.

2.      Defendants are not entitled to summary judgment on plaintiff's claims of religious discrimination and retaliation because plaintiff has adduced ample evidence that defendants treated non-Jewish employees who had not made complaints of discrimination more

favorably in numerous working conditions, including compensation, working hours, credit for professional work and general working conditions.

3.    Defendants are not entitled to summary judgment on plaintiff's claims of religious harassment and religiously hostile work environment because defendants created a working environment that was hostile to plaintiff because she was an observant Jew.

4.    Plaintiff has adduced sufficient evidence for a reasonable jury to infer that defendant TJU's failure to offer another position to plaintiff was motivated by prohibited discrimination and/or retaliation.

5.    Plaintiff filed action timely under the Pennsylvania Human Relations Act to assert the claims of religious discrimination, harassment, and retaliation which are set forth in her EEOC Charge No. 170A00980, and she has adduced ample evidence in support of those claims.

6.    Plaintiff will voluntarily dismiss Count VI, alleging negligent supervision.

7.    Plaintiff will voluntarily dismiss Count VII, alleging defamation.

## IV.  STANDARD OF DECISION

In deciding a motion for summary judgment, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 276 (3d Cir. 2001), *quoting Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000).  The court should not slice and dice the evidence, looking at each piece in isolation, but it must "view the record as a whole picture." *Id.*

In *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1071-1072

(1996) (*en banc*), the Court of Appeals for the Third Circuit set out the following considerations

which should guide the courts in deciding whether to take the decision of a discrimination case

from the jury:

> As the Supreme Court has noted, "[t]here will seldom be `eyewitness' testimony as to the employer's mental processes." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). We have recognized that "[d]iscrimination victims often come to the legal process without witnesses and with little direct evidence indicating the precise nature of the wrongs they have suffered." *Jackson v. University of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987), cert. denied, 484 U.S. 1020 (1988). Cases charging discrimination are uniquely difficult to prove and often depend upon circumstantial evidence. *See, e.g., Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081-82 (3d Cir. 1996); *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 48 (3d Cir. 1989); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir.) (en banc) *cert. dismissed*, 483 U.S. 1052 (1987); *Dillon v. Coles*, 746 F.2d 998, 1003 (3d Cir. 1984). "This is true in part because . . . discrimination . . . is often subtle." *Chipollini*, 814 F.2d at 899. "[A]n employer who knowingly discriminates . . . may leave no written records revealing the forbidden motive and may communicate it orally to no one." *Id.* (quoting *LaMontagne v. American Convenience Prods.*, 750 F.2d 1405, 1410 (7th Cir. 1984)).
>
> *            *            *
>
> The role of determining whether the inference of discrimination is warranted must remain within the province of the jury, because a finding of discrimination is at bottom a determination of intent. In making that finding, the jury must perform its traditional function of assessing the weight of the evidence, the credibility of the witnesses through observation of both direct testimony and cross-examination at trial, and the strength of the inferences that can be drawn from the elements of the prima facie case and the evidence that undermines the employer's proffered reasons for its actions. This is uniquely the role of the factfinder, not the court. *See Barber v. CSX Distribution Servs.*, 68 F.3d 694, 700 (3d Cir. 1995)("Evaluation of witness credibility is the exclusive function of the jury, and where the only evidence of intent is oral testimony, a jury could

always choose to discredit it." (quoting *Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 262 (3d Cir. 1987), cert. denied, 488 U.S. 1004 (1989))); *see also Aikens*, 460 U.S. at 716 ("It is true that it is very difficult to prove what the state of a man's mind at a particular time is, but if it can be ascertained it is as much a fact as anything else." (quoting *Edgington v. Fitzmaurice*, 29 Ch. Div. 459, 483 (1885)); *Chipollini*, 814 F.2d at 899 ("The issue of the defendant's intent at the time of the plaintiff's discharge is clearly a factual question.").

## V.   ARGUMENT

A.   **Ms. Druker's Second EEOC Charge Covers Religious Discrimination, Harassment and Hostile Environment As Well As Retaliation.**

Defendants seek summary judgment on Ms. Druker's claims of religious discrimination, harassment and hostile environment on the ground that she did not file her action in court until more than ninety days after receiving her Notice of Right To Sue from the EEOC on Charge No. 170A00980, the first charge she filed.

It is true that she did not timely file an action under Title VII based on that charge. Nevertheless, defendants concede that her action based on the claims made in Charge No. 170A01829 was timely. Although that action may not revive the claims made in the first charge, the second charge by itself is sufficient basis for all the claims made in the present action. Charge No. 170A01829 makes clear that Ms. Druker is still complaining of harassment and a hostile environment as well as retaliation for her complaints of discrimination. See Defendants' Ex. 42. Even though Ms. Druker did not check the box for "Religion," the particulars of the charge repeatedly refer to religious animus leading to harassment and discrimination as well as retaliation. Accordingly, the actions which are the subject of the present suit "are fairly within the scope of the [second] EEOC complaint, or the investigation arising therefrom" so Ms. Druker

has exhausted her administrative remedies. *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996),

*quoting Waiters v. Parsons*, 729 F.2d 233 (3d Cir. 1984) (*per curiam*).

   The Supreme Court recently made clear that the time limit for filing a claim of

hostile environment does not begin to run until the last act of harassment, and, "[p]rovided that

an act contributing to the claim occurs within the filing period, the entire time period of the

hostile environment may be considered by a court for the purposes of determining liability."

*National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101, 117 (2002).  Thus, timely

filing of suit based on Charge No. 170A01829 gives Ms. Druker a right to recover under Title

VII for the entire religiously hostile environment from which she suffered at the Center, although

she is precluded from recovering for discrete acts of discrimination that occurred more than 300

days before the September 7, 2000, filing date of that Charge.

   The cases cited by defendants at pages 25-26 of their Brief do not hold to the

contrary.  Those cases were all decided before *Morgan*, and none of them suggests that failure to

sue on the first charge deprives the plaintiff of claims that would be available if the first charge

had never been filed at all.  They simply hold that a second charge does not revive claims made

in the earlier charge.  Consistently with those cases, Ms. Druker acknowledges that failure to sue

on the earlier charge renders it totally ineffective; however, it does not have the negative effect

of subtracting from the claims which were actually encompassed by the second charge.  *Mason*

*v. State*, 583 F. Supp. 729 (D. Conn. 1984), for instance, involved a situation where the first

charge alleged only a discrete discriminatory act (denial of tuition benefits), and the Commission

had actually dismissed it even before the filing of the second charge, which alleged only

retaliation.  There is no resemblance to Ms. Druker's charges, which were largely overlapping.

None of the cases cited by the defendants involves a hostile environment claim or any other claim of continuous violation which *Morgan* protects from the statute of limitations.

B.    **Ms. Druker Has Adduced Ample Evidence To Make Out A Prima Facie Case of Religious Discrimination And Retaliation.**

Defendants apparently concede that Ms. Druker has shown that, as a Jew, she is a member of a protected class, and that she was qualified for her position.  They claim, however, that she has not adduced sufficient evidence to show that she suffered an adverse employment action and that she was similarly situated to individuals not of the same class who were treated more favorably.  Defendants grossly overstate the stringency of both of these requirements and understate the strength of Ms. Druker's evidence.

1.    **Ms. Druker Suffered Numerous Adverse Employment Actions.**

Defendants claim that "Ms. Druker did not suffer an adverse employment action prior to notification of her termination."  They base that statement on a very narrow definition of "adverse employment action" and an even narrower understanding of the adverse actions to which Ms. Druker testified.

First, the Court should "not analyze the employer's individual acts in isolation, but should analyze all of the acts collectively in deciding whether there has been adverse employment action." *LaFate v. Chase Manhattan Bank*, 123 F. Supp. 2d 773, 778 (D. Del. 2000) (Farnan, J.)  *Accord, Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly a discrimination analysis must concentrate not on individual incidents but on the overall scenario.

The overall scenario here shows a constant course of conduct that not only created a hostile environment for Ms. Druker but also caused a substantial adverse effect on the traditional terms and conditions of her employment compared to her fellow employees.  For instance, by refusing to perform any performance appraisal after May 1997, Dr. Turner deprived Ms. Druker of a potential salary increase.  As shown in Ms. Druker's log for July 22, 1999, Druker Dec. Ex. C, Dr. Turner and other employees reporting to her received raises, but Ms. Druker received neither a review nor a raise.  In addition, Dr. Turner decided that Dr. Newschaffer should borrow time of a non-Jewish employee outside the Center to serve as Project Manager under his grant to research the effects of tobacco smoke exposure on breast cancer, instead of Ms. Druker, to whom that work had been promised.  This decision deprived Ms. Druker of both salary and a title which would have been useful in future job applications.  Druker Dec. ¶ 10.  On more than one occasion, Dr. Turner hit Ms. Druker on the head hard and subsequently screamed at her and kicked a waste container at her.  Druker Dec. ¶ 42 and Ex. L.

Looking to those adverse employment effects which lasted throughout Ms. Druker's tenure at the Center, it is apparent throughout her logs that she was forced to work longer hours than other employees because she was required to account strictly for her work time and was not allowed any time for personal activities.

In November 1999, in particular, Dr. Turner took two actions which threatened to seriously affect Ms. Druker's employment -- she stated that she had closed off the possibility of Ms. Druker obtaining a research position for the Chairman of the Department, and she refused to provide Ms. Druker with the very positive and potentially helpful letter of reference which Dr. Turner had drafted.  These actions likely affected Ms. Druker's job prospects.  Druker Dec. ¶¶ 45, 46, 48, 49 and Ex. N, O, P.  The Third Circuit has held that a refusal to provide a reference,

standing alone, is an adverse employment action.  *E.E.O.C. v. L.B. Foster Co.*, 123 F.3d 746, 754

(3d Cir. 1997).  Finally, the very hostile environment itself is discrimination with respect to the

terms and conditions of employment.  *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64-65

(1986).

2.    **All Non-Jewish Employees Were Treated More Favorably.**

Defendants are wrong when they claim that Ms. Druker's evidence shows only

that she was treated differently from non-professional co-workers who reported to other

supervisors.  To the contrary, Ms. Druker's evidence shows that she was treated differently from

all other employees in the Center, including the other employees who reported to Dr. Turner.

Druker Dec. ¶¶ 7, 9, 10, 12, 14, 17, 21, 27, 33, 34, 40, 42, 47, 48 and Ex. C, D, J, K, N, O.

According to defendants' argument, an employer could prevent a minority

employee from making out a prima facie case by simply putting that employee in a different

category from all other employees and then claiming that there are no comparators.  That is not

the law.  Rather, once a plaintiff has proved that she is being treated differently from another

employee, the burden is placed on the employer to articulate a legitimate, non-discriminatory

reason for the different treatment.  It is not enough for the employer to show that they are in

different job categories; it must give a rational reason why that difference explains the different

treatment.

C.    **Ms. Druker Suffered Severe and Pervasive Harassment Based on Her Religious Beliefs.**

Specifically applying the test for granting or denying summary judgment in a case

of hostile religious environment brought by an Orthodox Jew, the Third Circuit held that "courts

should not consider each incident of harassment in isolation.  Rather a court must evaluate the

sum total of abuse over time."  *Abramson*, 260 F.3d at 279-80, *quoting Durham Life Ins. Co. v.*

*Evans, 166 F.2d, 155 (3d Cir. 1999).*

Defendants do not deny that Ms. Druker has adduced sufficient evidence for a

jury to conclude that she suffered intentional discrimination because of her religion, that the

discrimination adversely affected her, that the discrimination would detrimentally affect a

reasonable Jew in the same position, or that Ms. Druker has established a basis for vicarious

liability.  Indeed, the evidence shows that she suffered harassment both by her supervisor and by

her co-workers, and that reporting the harassment and the resulting hostile environment led not

to relief but rather to an intensification thereof.

Defendants' only asserted ground for summary judgment on Ms. Druker's hostile

environment claim is their assertion that the harassment was not "severe or pervasive."  The

litany of harassment set forth at length in Ms. Druker's Declaration, supported by her

contemporaneous logs and her deposition testimony, refutes that claim.  Defendants' error lies in

ignoring one of the basic holdings of *Andrews*.  Defendants' brief seems to suggest that the only

actionable incidents of harassment which Ms. Druker suffered were those which were explicitly

religious in nature.  In reversing the district court in *Andrews*, however, the Court of Appeals

held,

> To make out a case under Title VII it is "only necessary to show that
> gender is a substantial factor in the discrimination, and that if the plaintiff
> 'had been a man she would not have been treated in the same manner.'"
> *Tomkins v. Public Serv. Elec. & Gas Co.*, 568 F.2d 1044, 1047 n. 4 (3d
> Cir. 1977) (citation omitted).  To constitute impermissible discrimination,
> the offensive conduct is not necessarily required to include sexual
> overtones in every instance or that each incident be sufficiently severe to
> detrimentally affect a female employee.

895 F.2d at 1485.  Indeed, in *Andrews* the Court of Appeals directed the district court to consider

on remand not only evidence of name-calling and pornography but also "the recurrent

disappearance of plaintiffs' case files, anonymous phone calls, and destruction of other

property," *id.* at 1486, in other words harassment like much of that directed at Ms. Druker, which

was not overtly directed to her membership in a protected class.  Similarly, in *Howley v. Town of

Stratford*, 217 F.3d 141, 154-56 (2d Cir. 2000), the Court of Appeals for the Second Circuit held

that an entire series of actions which were not apparently related to the sex of the plaintiff should

be considered in deciding whether she had been subjected to a hostile work environment.  *See

also Abramson*, 260 F.3d 276-81.  See also *Blum v. Council Rock School Dist.*, 2003 U.S. Dist.

LEXIS 3022 *13 n.3 (E.D. Pa.) (hostile religious environment claim may be based on series of

actions, many of which were not overtly related to plaintiff's religion, including mold-infested

classroom facilities).

   When Ms. Druker first went to work at the Center, she was greeted with

negatively tinged questions about her religion.  Thereafter, she was subjected to continuous

religious discrimination in her working conditions, including being shouted at and ridiculed by

her supervisor, treatment that was not inflicted on anyone who was not Jewish.  When she was

confronted with swastikas on the elevator and complained to Dr. Turner, Human Resources and

the Director, Safety and Security, no action was taken.  TJU's EEOC Coordinator told Ms.

Druker that she was going to file the complaint but that was all.  Druker Dec. ¶ 4.  Even though

Ms. Druker's job was reclassified to a professional classification, she was denied any

concomitant raise in pay.  Druker Dec. ¶ 7.  Even though she was entitled to be paid for

overtime, she was denied it.

Even if everything that Ms. Druker suffered in her first year and a half working for Dr. Turner did not rise to the level of a hostile environment, there can be no doubt that he environment became truly hostile in the fall of 1998.  That is when the following events occurred within a period of a few days more than three months:

- Dr. Turner herself disparaged Ms. Druker and her observance of Rosh Hashanah and Yom Kippur.  Druker Dec. ¶ 19.

- Dr. Turner and Mr. Louis flatly refused to take any action to end the discrimination and harassment which Ms. Druker was suffering from her co-workers.  Druker Dec. ¶¶ 20, 23 and Ex. D.

- Dr. Turner began requiring Ms. Druker to account for her every instant on the job. Druker Dec. ¶ 21.

- Ms. Druker was blamed by both Dr. Turner and Mr. Louis because her co-workers would not cover the reception desk while she was attending a conference, so she was caught in the middle of a dispute between them over who would pay for a temporary employee. Druker Dec. ¶ 22.

- Ms. Druker began to become physically ill as a result of the hostile environment, suffering frequent sick headaches, chest pains, stomach pains and diarrhea.  Druker Dec. ¶ 24 and Ex. C, log entry for 10/28/98.

- TJU EEOC Coordinator Johanna Schoeller made clear that she was not going to take any action, and told Ms. Druker, "Take your best shot, but you're not going to win because Dan Louis is Jewish."  Druker Dec. ¶ 29.

- When she arrived at work one morning, Ms. Druker found a vicious, obscene note on her chair under a report from Dr. Turner.  Druker Dec. ¶ 30 and Ex. F.

- Mr. Louis ridiculed Ms. Druker, and no investigation was made.  *Id.*

- Shortly thereafter, Theresa Wilson was talking to someone else in the office and said "about two weeks ago" and "Jewish," then laughed.  Druker Dec. ¶ 31.

- Dr. Turner cancelled Ms. Druker's year-end vacation because Santa wasn't coming to Ms. Druker's house, but other employees were allowed to sign up for vacation then. Druker Dec. ¶¶ 33, 34.

- Dr. Turner required Ms. Druker to work on Saturday, the day after New Year's Day, even though it was the Jewish Sabbath.  Druker Dec. ¶ 35.

As shown by Ms. Druker's Declaration and the samples of her log that are attached, the harassment continued on a regular basis as long as Ms. Druker was working at TJU. There can be no question but that Ms. Druker was subjected to harassment at least from September 1998 through December 1999.  The only legitimate question is whether all of the harassment was motivated by religious discrimination.  Under the Third Circuit and Supreme Court authority, that is a question properly answered only by a jury, which can justifiably infer anti-Semitic motive from Dr. Turner's disparaging remarks about Ms. Druker's religious observance, the unjustified inferior treatment to which Ms. Druker was subjected in contrast to all non-Jewish employees, and the permissive attitude shown by her employer toward swastikas, anti-Semitic slurs, Christian music, a crucifix, and Christian proselytizing material which appeared in the workplace.  Ms. Druker's repeated requests for help from Dr. Turner, Mr. Louis and Human Resources brought her no relief.

D.    **Ms. Druker Suffered Retaliation in Termination and Otherwise.**

As made clear above (Sections B and C), Ms. Druker suffered numerous adverse employment actions in addition to the termination of her employment. To the extent those actions took place in or after October 1998, when it is clear that Dr. Turner knew and understood that Ms. Druker was complaining of religious discrimination, those actions also support Ms. Druker's claims of retaliation. Therefore, Ms. Druker's claim of retaliation survives whether or not defendants have adduced legitimate non-discriminatory reasons for their failure to hire Ms. Druker in another position when Dr. Turner left TJU. For instance, defendants cannot deny that Ms. Druker has adduced sufficient evidence to reach the jury on her claim that Dr. Turner threatened to prevent Ms. Druker from obtaining another position at TJU and that Dr. Turner refused to provide her with a letter of reference. Druker Dec. ¶ 48, 49 and Ex. O, P. See Defendants' Brief at 34. Those actions by themselves constitute an adverse employment action. *E.E.O.C. v. L.B. Foster Co.*, 123 F.3d 746, 754 (3d Cir. 1997).

In addition, as the EEOC stated in its Determination, "the evidence obtained during the investigation establishes violations of Title VII based on retaliation when Charging Party was denied the opportunity to transfer to a vacant position and was ultimately discharged after she complained of discrimination." Exhibit 2 hereto, p. 2.

This conclusion is supported by ample evidence. First, if Ms. Druker's testimony is to be believed, as it must be in considering this motion, Dr. Turner had specifically told her that the avenue to one prospective job was "closed" and had suggested that Dr. Turner was responsible for closing it. Ms. Druker understood Dr. Turner to be implying that she would prevent Ms. Druker from obtaining any job over which she had influence. Druker Dec. ¶¶ 46, 48. Dr. Turner had actually drafted quite a favorable letter of reference, but she never used it or

showed it to Ms. Druker.  In fact, Dr. Turner told Ms. Druker she would not give her any reference letter, because Dr. Turner was "uncomfortable."  *Id.*  Although, as defendants admit, Ms. Druker "sought employment for numerous positions at TJU,"  Defendants' Brief at 18, she received not one job offer.  By contrast, her coworker Jim Cocroft had no trouble finding a position with Dr. Ronald Myers in Medical Oncology.  Defendants' Ex. 39.  Absent conclusive rebuttal, the jury should be allowed to infer that Dr. Turner made good on her threats.

The evidence of causation in the present case is much more than just a temporal relationship, in which a complaint of discrimination is followed shortly by an adverse action. Instead of that fairly tenuous connection, Ms. Druker's evidence shows that her numerous complaints of discrimination were followed by her powerful boss's adverse action in the form of a threat, and then the actualization of the consequences of that threat.  Dr. Turner suggested that she was going to prevent Ms. Druker from getting another job, and in fact Ms. Druker's numerous applications for other suitable employment met with no success.  There can't be any facts which are more "unusually suggestive" than that.  *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997).   In addition, there is the curious unhelpfulness of Mary Legner, the person at Human Resources who was supposed to be helping Ms. Druker find another job, but did not find her even one interview, forcing Ms. Druker to carry out her search on her own. Druker Dec. ¶ 52.  In fact, Ms. Legner seemed to place more emphasis on asking Ms. Druker whether she had signed her separation agreement than in finding her new job opportunities. Defendants' Ex. 42, 3d page.

Defendants would have the Court believe that their affidavits provide conclusive rebuttal, but defendants substantially overstate the strength of that rebuttal.  Defendants assert that most of the persons who signed their affidavits "denied having any communication with Dr.

Turner about hiring Druker." Defendants' Brief at 36. In fact, none of them denied having any

communication with Dr. Turner about hiring Ms. Druker; they denied only having **spoken** with

Dr. Turner about that subject. In this day and age, it is not unlikely that they had email

correspondence on the subject, or even left each other voicemail messages.

      In fact, the differences among the affidavits are quite instructive. Alone among

all the affiants, Dr. Barry Goldstein says, "My decision not to hire Ms. Druker for this position

was not influenced by Dr. Barbara Turner." Defendants' Ex. 35, ¶ 3. Despite the marked

similarity among the affidavits, suggesting that they were all drafted by defendants' attorneys,

none of the other affiants makes that representation. That clearly suggests that their decisions

were influenced by her even if they did not "speak" with her, as they are very careful to say.

      Moreover, some of the denials of having spoken with Dr. Turner are themselves

narrowly worded. For instance, Cheryl Scully says, "I did not speak with Dr. Barbara Turner

about hiring Ms. Druker for a position in the Controller's Office." Defendants' Ex. 37, ¶ 3. That

leaves open the possibility that she spoke with Dr. Turner about hiring Ms. Druker for some

other position or about Dr. Turner's impressions of Ms. Druker without reference to any

particular hiring decision. Regina Gallagher's affidavit is similar in that respect. Defendants'

Ex. 38, ¶ 4.

      Then there is Dr. Ronald Myers, who says nothing about talking with Dr. Turner

or being influenced by her and therefore admits by his silence on this subject that he spoke with

Dr. Turner and was influenced by her. Defendants' Ex. 39. Dr. Myers' explanation for not

hiring Ms. Druker is that he had only one position available on the day she contacted him, and

she was not qualified for it. He leaves open the possibility, however, that a position more

suitable to Ms. Druker came open the next week or even the next day, and he has no explanation

for not calling Ms. Druker back to offer her that position, except for the implication that he was
influenced by Dr. Turner.

       The various affiants' denials that they were aware of Ms. Druker's discrimination
complaints does not take defendants very far.  As long as these decision-makers were influenced
by someone who was acting in retaliation for those complaints, their actions were retaliatory
whether they were aware of it or not.

       In addition to the failure of most of the affiants to deny that they were influenced
by Dr. Turner, there are other reasons not to credit several of TJU's claimed legitimate non-
discriminatory reasons for not hiring Ms. Druker.  Eric Pownall's affidavit, for example, is
contradicted by what he told Ms. Druker when he interviewed her.  He interviewed Ms. Druker
for a Grant and Contract Specialist position in the Controller's Office.  His affidavit gives the
impression that Ms. Druker made a negative impact on him, and he did not believe she was
qualified for the job.  Defendants' Ex. 36.  When he actually interviewed Ms. Druker, however,
he told her that he was impressed and would recommend to Cheryl Scully, head of the
department, that she be interviewed further.  Druker dep. 6/23/03, p. 391.  Mr. Pownall says he
spoke with Ms. Scully about his interview with Ms. Druker, and they agreed that Ms. Druker
"did not have sufficient experience in grants to qualify for the position."  Defendants' Ex. 36, ¶
3.  Notably, Ms. Scully's own affidavit does not confirm either that she conferred with Mr.
Pownall about Ms. Druker or that Ms. Druker was unqualified for the position.  All she says is
that she does not rccall speaking with Ms. Druker about the position and that she did not speak
with Dr. Turner about hiring Ms. Druker.  Defendants' Ex. 37.

       Although Mr. Pownall denies generally speaking with Dr. Turner about Ms.
Druker, Ms. Scully denies only speaking with Dr. Turner about hiring Ms. Druker for a position

in the Controller's Office, leaving open the real possibility that she spoke or otherwise communicated with Dr. Turner about Ms. Druker without specifically referring to the possibility of hiring her.  In addition, neither Mr. Pownall nor Ms. Scully denies being influenced by Dr. Turner with respect to this decision.  Nor does either of them claim that the person hired into the position was more qualified than Ms. Druker.  The contradiction between Mr. Pownall's affidavit and what he told Ms. Druker at the interview, together with the other gaping holes in defendants' evidence, raises a credibility issue which requires that this issue be left to the jury.

Similarly, Ms. Druker says that Dr. James Erdmann called her, invited her to the Faculty Club for an interview, and was sufficiently impressed to ask for writing samples.  When he misplaced those samples, he had someone call and ask for another set.  Druker dep. 6/23/03, pp. 370-72.  By contrast, in his deposition Dr. Erdmann testified that the interview convinced him "that she was not right for the job."  Erdmann dep., p. 15, Defendants' Ex. 15.  *See also id*., p. 18.  Ultimately, he hired someone from outside TJU.  At Dr. Erdmann's deposition he purported to recall that he found Ms. Druker "pretentious, overly aggressive, somewhat arrogant and did not strike me as a team player."  *Id.*, p. 15.  Even though he claimed to have this vivid memory of Ms. Druker at his deposition, he also admitted that, when he was first contacted for his deposition, he had said he had no recollection of her at all, and, further, that he had no memory of the written communications he had received from her.  *Id.*, pp. 15-18.  Further, Ms. Druker says he told her later that he was apprehensive about hiring someone from Dr. Turner's team. Druker dep. 6/23/03, p. 372.  Not only is that inconsistent with his deposition description of his decision process, but also he denies saying that to her.  Erdmann dep., pp. 19-20, Defendants' Ex. 15.  Again, the inconsistency between what Dr. Erdmann said to Ms. Druker and what he testified at his deposition requires resolution by a jury.

Finally, defendants' purported legitimate nondiscriminatory reasons are contradicted by Dr. Turner's own words and actions, which show that Ms. Druker was highly skilled at a demanding, multi-faceted job.  When Dr. Turner was about to leave TJU and needed to make sure that the accounting for her grants was in order, it was Ms. Druker whom she relied upon to straighten it out.  Tha accounting had been handled by the Center administration, but Dr. Turner directed them to turn it over to Ms. Druker for review.  Druker Dec. ¶ 50 and Ex. Q.  As that correspondence shows, Dr. Turner followed Ms. Druker's advice in solving at least one sticky problem.

Moreover, Dr. Turner's letter of reference for Ms. Druker is highly laudatory.  Her own words testify to Ms. Druker's skills in project management, administration of multi-million-dollar grants, and technical writing.  Above all, she praises Ms. Druker's "interpersonal skills."  Druker Dec. Ex. P.  This testimony casts doubt on the defendants' smokescreen defense that Ms. Druker was rejected for other positions because she was "rude" and "pushy."  *See* defendants' brief at 9, 18-20.  It is striking how often employers say that employees who stand up for their rights are rude and pushy.  That argument is actually code for retaliation.

E.    **Ms. Druker's Claims Under the PHRA Are Still Viable.**

Defendants recognize that Ms. Druker's PHRA claims based on the first charge she filed with the EEOC, Charge No. 170A00980, Defendants' Ex. 22, as amended, Defendants' Ex. 24, were timely filed.  Moreover, although Ms. Druker did not file this action in time to assert the Title VII claims described in that charge, the action was filed in time to preserve the PHRA claims.  Under 43 P.S. § 962(c)(2), the action can be filed within two years after the PHRC closes the complaint.  That action alleged both religious discrimination and retaliation.  Accordingly, it is of no moment that her second charge was filed too late to assert additional

claims of retaliation. Inasmuch as the first charge covered the basic claim, it was not necessary for Ms. Druker to file a second charge to add additional instances of the defendants' wrongful conduct. The untimeliness of the second charge to assert any claims under the PHRA is of no moment because those claims are covered by the first charge.

As defendants have noted, the analysis of the claims is basically the same under the PHRA as under Title VII, so summary judgment would be as unjustified on the PHRA claims as it would on the Title VII claims.

Defendants' argument for dismissal of the claims against Dr. Turner under the PHRA must fail for two reasons. First, a substantial part of Ms. Druker's claims is based on Dr. Turner's participation in TJU's conduct condoning a hostile environment which was created by the actions of others besides Dr. Turner. Second, the case on which defendants rely, *Dici v. Commonwealth*, 91 F.3d 542, 552-53 (3d Cir. 1996), holds only that a rank and file employee who has no supervisory responsibility and is alleged only to have committed harassing acts cannot be found liable for aiding and abetting. Therefore, the court dismissed defendant Brison from that case. On the other hand, it refused to dismiss defendant Monaco because he was a supervisor and therefore might be liable for aiding and abetting the employer.

Because she stands in the same position as supervisor Monaco, Dr. Turner may be held liable for aiding and abetting, so summary judgment should not be granted to her.

F. **Ms. Druker Will Voluntarily Dismiss Her Negligent Supervision Claim.**

G. **Ms. Druker Will Voluntarily Dismiss Her Defamation Claim.**

## VI.     CONCLUSION

In many discrimination cases, discriminatory intent must be inferred solely from differences in treatment between persons in the protected class and others.  In this case, however, defendants have let their real attitudes show through from time to time.  They have allowed the veil covering their anti-Semitism to slip, so there can be no doubt that plaintiff has adduced sufficient evidence for a reasonable jury to infer that religious animus motivated defendants' mistreatment of her.

ECKERT SEAMANS CHERIN & MELLOTT

Dated:  October 15, 2003                              By_____/s/_____
                                                                              William H. Ewing
                                                                              1515 Market Street, 9th Floor
                                                                              Philadelphia, PA  19102-1909
                                                                              215/851-8420