**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SONDRA G. DRUKER,                      :
                                       :
                   Plaintiff,          :
                                       :
          v.                           :
                                       :          CIVIL ACTION
THOMAS JEFFERSON UNIVERSITY            :
                                       :          NO. 02-CV-2692
          and                          :
                                       :
BARBARA J. TURNER, M.D.,               :
                                       :
                   Defendants.         :

**<u>DECLARATION OF SONDRA G. DRUKER</u>**

Sondra G. Druker declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am the plaintiff in this action.

2.      I started working for Dr. Barbara J. Turner at the Center for Research in Medical Education and Health Care ("Center") on or about February 10, 1997.

3.      Attached hereto and marked as Exhibit "A" is the list of staff of the Center which appeared in the Center's Annual Report for 1997-98.

4.      After I complained to Dr. Barbara Turner, to Human Resources and to the Director, Safety and Security at Thomas Jefferson University about the swastikas I found in an elevator in January 1998, I was not informed that TJU had made any investigation or taken any other action taken to discover and discipline the perpetrator of that desecration. TJU's Employee Relations EEOC Coordinator Johanna Schoeller told me that she was going to put my memo to her detailing the incident and including a Xerox copy of the offensive and racist material in her file but not take any action.

- 1 -

5.     Shortly thereafter my position title was changed from Administrative Assistant to Clinical Research Assistant/Coordinator.  It is wrong to suggest that this change came about because Dr. Turner needed to change my title for the sake of funding.  To the contrary, the title change was a result of my own initiative.  I approached both Dr. Turner and Human Resources requesting a reclassification because the Administrative Assistant title did not accurately reflect the duties and level of responsibility I had.

6.     As Dr. Turner herself wrote in her Memorandum to John Monnier of College Finance, the new title of my position was "to more accurately reflect the work and responsibilities of the employee since her arrival."  A copy of that Memorandum is attached hereto and marked as Exhibit "B".

7.     Although I agreed to forego an immediate increase in pay, Dr. Turner promised that I would receive an increase within a few months, but I was never given that raise.

8.     Angela Cimino of the TJU compensation office informed me that my position as Clinical Research Assistant/Coordinator made me a professional, non-exempt employee by classification.

9.     Nevertheless, I was consistently treated differently from other professional employees who are not Jewish or who are not observantly or overtly Jewish.  For one thing, even though I was classified as a professional employee, the Center Annual Report listed me with Support Staff instead of professional staff.  Of the fourteen persons listed as professional staff, twelve were non-Jewish, and the two Jews were not observant, as far as I could tell.  Dr. Turner told me that the reason I was not listed with the professional staff was that I had only a Bachelor's degree, but that was obviously not true because two of the fourteen shared my lack of any higher degree.  See Exhibit "A".

10.    In addition to serving Dr. Turner, I was also required to work for Dr. Craig Newschaffer, a researcher who reported to Dr. Turner.  I provided a great deal of help to Dr. Newschaffer in obtaining a grant for research on a link between passive tobacco smoke exposure and breast cancer, and in return he promised me that I would be the Project Manager for the research project, which would have provided an important additional qualification for me in any future job application as well as substantial funds to augment my salary at the time. When he received the grant, however, he borrowed time of a non-Jewish employee from elsewhere in the University to serve as Project Manager.  He told me that Dr. Turner had made that decision.  Dr. Turner told me that the other employee was chosen because she had a Master's degree, but that was not true.  As it turned out, her experience was so limited that Dr. Newschaffer had to call on me to assist her in performing the Project Manager position.

11.    When it became apparent to me that I was being treated differently because of my religion, I began to maintain a log in which I wrote down many of the incidents of discrimination and other behaviors which I experienced.  Although that log does not reflect everything that happened, it is accurate as far as it goes.  A copy of sample pages from the log recording such discriminatory treatment is attached hereto and marked Exhibit "C".

12.    As my log records, I was also treated differently from non-professional employees who were not Jewish.  Ellen Shepherd, Beth Montanti and Theresa Wilson were clerical employees who worked for the Center.  None of them are Jewish, and they were consistently treated better than I by being allowed to take time off to attend classes or engage in personal activities, often on company time.  They were allowed to engage repeatedly and continuously in questionable behavior without even a reprimand, while I was subjected to screaming, public denunciation and ridicule for minor or even imagined missteps.

13.     When I first arrived to work at the Center, Shepherd greeted me with the words, "I heard you're Jewish" or words to that effect.  She had apparently already called a mutual acquaintance, asking for personal information about me. Wilson asked me, "You are Jewish, aren't you?"  When I answered affirmatively, a sour expression appeared on her face. Ever since then, they had created a hostile environment for me by various comments and made my performance of my job more difficult by treating me differently from other, non-Jewish workers.

14.     For instance, we were each supposed to take shifts covering the phones and manning the front receptionist desk, and we were supposed to cooperate in covering for one another.  I covered for them, and they covered for each other, but they often refused to cover for me.

15.     Ms. Wilson also regularly played loud Christian music in the office and once put Christian proselytizing literature in my mail box.

16.     On one occasion, I heard Ms. Wilson use the term "fucking Jew" in a telephone conversation.

17.     When I put up a Star of David in my cubicle in celebration of a religious holiday, it soon disappeared.  By contrast, a crucifix and Christmas decorations were permitted and were not disturbed.

18.     I spoke with Dr. Turner several times about these problems, but she brushed me off every time.

19.     In the fall of 1998, Dr. Turner was extremely belligerent when I asked for a reasonable time accommodation to observe Rosh Hashanah and Yom Kippur.  She refused to approve my request for Yom Kippur until one or two days before the holiday, which started the

evening of September 29.  When I pressed her, she finally said, "Fine, okay, but I'm losing time

here."  When I returned after the Yom Kippur holiday (the holiest day of the Jewish calendar),

she came to my desk and asked loudly, "So, do you people have any more god damned holidays

or what?"  In retaliation, she forced me to work overtime for the next few days without

compensation.  It should also be noted that in answer to her question, I informed her of the

upcoming Sukkoth holiday, to which she replied, "Yeah, well you don't have any more fuckin'

time!"

   20. I began to complain to Human Resources about the discrimination and

harassment to which I had been subjected.  On October 22, 1998, after Dr. Turner learned that I

had complained to Human Resources, she called me into her office.  I explained my complaints

at length to Dr. Turner, but she refused to take any action to remedy the discrimination and

harassment.   Attached hereto and marked as Exhibit "D" is a copy of my contemporaneous log

entry which accurately records that meeting with Dr. Turner.

   21. As shown in that log entry, one of the ways in which Dr. Turner retaliated

against me for complaining to Human Resources about the hostile environment at the Center,

particularly emanating from her, was to require me to give her a daily, detailed log of my every

activity and the precise time I arrived in the morning, went to lunch, returned from lunch, and

went home in the evening.  I had never given her any reason to doubt my timeliness, but, for the

rest of my tenure at the Center, I had to endure this onerous and time-consuming requirement,

which was not imposed on anyone else, professional or non-professional.

   22. One of the events which precipitated that meeting with Dr. Turner was the

Center's handling of my attendance at a meeting of the Society of Research Administrators,

which was held in Philadelphia.  I was forced to attend on my own vacation time, but of course it

was necessary to make sure that the telephone in our office was covered during my absence.

When I asked the other support staff to cover, they refused.  Daniel Louis, Managing Director of

the Center, refused to direct them to do it.  He said that a temporary worker should be hired and

paid from Dr. Turner's budget.  Dr. Turner said the Center's general budget should pay.  I was

caught in the middle and was blamed by both of them for sending Mr. Louis an email telling him

what Dr. Turner had told me.  It should be noted that although I was forced to use my own time

and money to attend this professional meeting, Dr. Turner demanded that I bring back

informational materials and prepare an "in service" presentation for colleagues on my own time.

      23.     At that time, I explained to Dr. Turner (not for the first – or last -- time)

and to Dr. Louis the discrimination and harassment I was suffering from Ms. Shepherd, Ms.

Montanti and Ms. Wilson, but they refused to take any action to stop it.

      24.     In October 1998 the hostile environment began to make me physically ill,

as described in my log entry for October 28, which is part of Exhibit "C".

      25.     After I had complained of discrimination and retaliation to Human

Resources and to Dr. Turner, her attitude toward me appeared to change.  Although she had

never been a pleasure to work with, after that she seemed never to be satisfied with anything I

did, and she imposed on me more rigorous employment conditions than any of the non-Jewish

(or non-observant or non-overtly Jewish) employees in the Center.  The only employee whom

she seemed to treat similarly was Dr. Susan Marcus, who is also Jewish and, I believe, observant.

      26.     Dr. Marcus was a statistician who originally worked at Thomas Jefferson

University but who had gone to work for the University of Pennsylvania.  Dr. Marcus had

worked on several papers with Dr. Turner.  They had an altercation when Dr. Turner refused to

give Dr. Marcus credit for two of the papers.  Subsequently, I overheard Dr. Turner telling

another TJU employee in a loud voice that she was going to tell her husband, who was a prominent and powerful physician at the University of Pennsylvania, to tell people there not to use Dr. Marcus for their research activities.  Dr. Marcus subsequently suffered a loss of funding and was forced to leave the University of Pennsylvania and seek employment out of Pennsylvania.

27.    Dr. Turner had evaluated my performance at the end of May 1997 as "Highly Effective."  In 1998, she did not give me any performance appraisal, telling me that there was no money for a raise so she was not going to do an appraisal.  In 1999, I repeatedly asked her to sit down with me and do a performance appraisal, but she kept putting it off, and she never did it.  I believe that her refusal to provide me with this performance appraisal  was motivated by discrimination and/or retaliation for my complaints of discrimination because any appraisal would have been positive, and therefore I would have been entitled to a raise.

28.    I complained numerous times to Johanna Schoeller, TJU's EEOC coordinator, and, on about November 3, 1998, sent her the written complaint which is attached hereto and marked as Exhibit "E".

29.    I asked Ms. Schoeller what to do about the problem.  I was seeking an amicable resolution, but I made clear that, if the problem was not resolved, I would have to go to the EEOC.  At that time she told me, "Take your best shot, but you're not going to win because Dan Louis is Jewish."  I was shocked by her remark.  Dan Louis is the Managing Director of the Center.  As I told her, he may be Jewish by ancestry, but he is not observant.  Ultimately, Ms. Schoeller was no help at all; she just advised me to look for another job outside of Thomas Jefferson University, which would have resulted in a loss of salary, benefits, pension, seniority, a preferred lifestyle, and more.

30.     Only six days after the date of my letter to Johanna Schoeller, I arrived at work at 8:15 a.m. and found on my chair, under a report from Dr. Turner, the shocking documents of which a copy is attached hereto and marked as Exhibit "F".  I reported the incident to Dr. Turner, who did not seem very concerned, and to campus security.  Even though it was obviously committed within a locked office, to which only a few people had keys, there was no perceptible investigation, and the persons who had shown hostility toward me continued to do so.  In addition, Mr. Louis ridiculed me when I informed him of the incident and told me that he would not be taking any action.

31.     Indeed, shortly thereafter, as shown in my log entry which is attached hereto and marked as Exhibit "G", Theresa Wilson was talking with someone else in the office, and I heard her say "about two weeks ago" and "Jewish".  Then they laughed.

32.     At some time after that, Ellen Shepherd told me that she appreciated Mr. Louis as a boss because he was easygoing.  She said she had had "problems" with Jewish bosses before.  She also proceeded to tell me she had a Jewish professor for some class she was taking and was concerned that she would do badly in class.  This conversation confirmed the impression which she had already given me – that she had a general negative attitude toward Jews.

33.     As we approached the end of the year 1998, I scheduled and obtained Dr. Turner's approval for vacation time between Christmas and New Year's Day.  When I arrived at work on December 4, however, Dr. Turner called me into her office before I could even take my coat off and directed me to cancel my vacation.  She said that she needed me to prepare a grant application then.  Dr. Turner had known about this application more than two months before it was due, but she had again waited until the last minute to decide that she wanted to apply for the grant.  She said, in substance, "Well, Christmas isn't exactly your holiday so you don't have your

heart set on it.  It's not like Santa's coming to your house."  When I told Dr. Turner that I was

offended by her remark, she told me to leave her office and pushed me toward the door.

34.    Non-Jewish Center employees (professional and non-professional) were

allowed to sign up and take their vacations during that week without any objection.  Indeed, after

Dr. Turner cancelled my vacation, Kaye Maxwell and Mary Robeson signed up for vacation

between Christmas and New Year's and were allowed to take it with no problem.  Kaye Maxwell

is one of the Center employees who has only a Bachelor's degree but was listed with

professional staff in the Annual Report.

35.    To add insult to injury, Dr. Turner forced me to work on Saturday, January

2, 1999, even though it was the Jewish Sabbath.  She regularly refused to accommodate my

request to observe the Sabbath by stopping work before sundown on Friday.

36.    Dr. Turner's conduct in 1998 substantially deterred me from seeking time

off for any future religious holidays.  Fortunately, in 1999 the first two days of Rosh Hashanah

fell on a weekend.

37.    After Johanna Schoeller had refused to provide me with any assistance in

stopping the harassment, I learned that she had left Thomas Jefferson University and I went to

Eric Righter, whom I understood to have taken over Ms. Schoeller's responsibilities for such

matters.  I spoke with him in February 1999 and made clear that I believed I was being harassed

by Dr. Turner and others in the office on account of my religious beliefs and complaints, and that

Dr. Turner had refused to stop it.

38.    I spoke with Mr. Righter on numerous occasions after that and sought his

help in ending the harassment and retaliation.  On or about June 1, 1999, I delivered to him the

memorandum which is attached hereto and marked as Exhibit "H", which amounted to an

ultimatum saying that I would file a charge with the EEOC and PHRC if TJU did not take prompt action.

39.     When I received no response from Mr. Righter, I went ahead and filed a charge with the EEOC.  I then told Dr. Turner that I had filed the charge and gave her a memorandum to that effect.  A copy of that memorandum is attached hereto and marked as Exhibit "I".  Although I told Dr. Turner that I would like to work things out with her, she became very angry.

40.     Soon thereafter, Dr. Turner invited everyone else on her staff to a farewell lunch for our colleague Dr. Craig Newschaffer, but she did not invite me, and in fact tried to keep the lunch secret from me.  When I protested to her orally and in writing, she lied to me by insisting that it had been a meeting rather than a farewell lunch.  Attached hereto and marked as Exhibit "J" is a copy of my log entry which accurately records the events that occurred that day.

41.     Every time I made a complaint to Dr. Turner, her discrimination, harassment, and retaliatory activities appeared to intensify, as exemplified by my log entries for July 2, 7 and 16 and August 2 and 23, 1999, which are attached hereto and marked as Exhibit "K".

42.     The extreme came on August 24 or 25, when she hit me hard on the head to get my attention while I was talking on the telephone and, shortly thereafter, flew into a rage, screaming obscenities, and kicked a blue waste recycle container at me.  Attached hereto and marked Exhibit "L" is a copy of the memorandum which I gave to Eric Righter complaining about this behavior.  I also placed a call to the Director of Security to seek protection.  Neither of them took any action to prevent a recurrence or other harassment in the future.  I never saw or heard of Dr. Turner doing anything like this to a non-Jewish employee.  To the contrary, when

non-Jewish employees were on the telephone and she wanted their attention, she used a pleasant "Excuse me" or other polite form of interruption.  This incident also led to ridicule and embarrassment at least in the Center office as word got around.

43.     For some time, I had been attempting without success to secure another appropriate position within TJU.  I was referred to Mary Legner, a Human Resources employee who was supposed to help with that search, but she was not helpful.

44.     I continued to seek help from Eric Righter, and, on October 29, provided him with an extensive list of the harassment and other discriminatory treatment to which I had been subjected.  A copy of that list is attached hereto and marked as Exhibit "M".  Mr. Righter was not helpful in any way except that he did suggest that I speak with Dr. Geno Merli, who was the Division Director of General and Internal Medicine, to whom Dr. Turner reported with respect to her medical practice.  I had expressed some trepidation to Mr. Righter since Dr. Merli and Dr. Turner had always appeared to be somewhat friendly.  Mr. Righter told me to proceed and I did so.

45.     After considerable effort, I was able to obtain a meeting with Dr. Merli, and I told him of the harassment I had experienced from Dr. Turner.  He told me that he was aware of a potential job opening in a new research center which the chair of the department was planning to set up, a position for which he thought I would be very good.  He suggested I submit my resume.  Attached hereto and marked Exhibit "N" are my log entry discussing the meeting and the follow-up letter I sent to Dr. Merli with my resume.

46.     Shortly thereafter, Dr. Turner summoned me into her office.  She was very angry that I had told Dr. Merli about her conduct toward me.  She threatened to sue me and told me that she would make sure I didn't work in the Philadelphia area again.  She said she knew

about the job he had discussed with me, and said in no uncertain terms, "That avenue is closed." She gave me to understand that she was responsible for closing the avenue to that job, and that she could be responsible for more.

47.    At that time Dr. Turner had already received an offer from the University of Pennsylvania and had decided to move there.  She had informed all the non-Jewish employees who worked for her, but she had not informed me.  Although I had heard rumors that she was leaving, I was not informed by anyone in authority until Dr. Merli mentioned it in my meeting with him.  Dr. Turner did not tell me of her plans to leave until I approached her and she admitted that she had recently been approached by Dr. John Spandorfer of her medical practice, who felt that her actions were inappropriate and unfair, and that she should speak with me. Subsequently, I received a formal notification letter from Mr. Louis dated November 30, 1999, but I did not receive it until several days later, in December.

48.    Dr. Turner offered positions at Penn to the non-Jewish members of her team, or helped them to obtain other positions at TJU, but she did not help me in any way.  To the contrary, she told me explicitly that she would not give me a letter of reference because she was "uncomfortable".  She asked me to give her a list of people I was interviewing with.  I did not do that because her comments to me led me to believe that any reference she might have given for me would be negative.  She also refused even to give me time off for an interview, as shown on my 11/18/99 log, which is attached hereto and marked Exhibit "O".  She had pleasantly allowed Jim Cocroft, a non-Jewish employee, to take a significant amount of time off to interview for other positions and even offered to cover his expenses with her funding until he was able to transfer into a new job.

49.     Years later, during the course of this law suit, I learned that Dr. Turner had prepared the letter of reference of which a copy is attached hereto and marked as Exhibit "P", but she never gave that letter to me or even told me that she had prepared it.  If she had given me that letter, I might have had a much better chance of obtaining another position at Thomas Jefferson University, where I very much wanted to stay.

50.     Exhibit "P" confirms the fact that Dr. Turner relied on me for high quality work despite the constant harassment and retaliation she inflicted on me.  That reliance is also shown by the memoranda dated November 24, November 30 and December 2, 1999, which are attached hereto and marked as Exhibit "Q".  I wrote those memoranda to her in carrying out her assignment to me to review all her grant files and fix any problems with the financial accounting. Even though she had transferred the day-to-day administration of the grants to the Managing Director's office, she came to me then to review everything and make sure that it was correct.

51.     During November 1999, when I was complaining to Eric Righter about Mary Legner's unhelpfulness with my job search, he told me that she said that I had not been in touch with her since our initial contact in early 1999.  That was simply not true.  As stated in the memorandum which I wrote to her on November 22, a copy of which is attached hereto and marked as Exhibit "R".  I had been in touch with her repeatedly, but she had not been helpful.

52.     Because Ms. Legner was not helpful, all of my job search activities were done on my own.  She never arranged even one interview for me.  I applied for numerous jobs within TJU for which I was well suited, but I was not accepted for any of them.

53.     Attached hereto and marked as Exhibit "S" is a copy of a memorandum I conveyed to Eric Righter on November 26, 1999, confirming my meeting with him in which I had updated him on the problems I was facing.

54.    Things only got worse in December 1999, my last month at TJU.  The stress got to me, and I was forced to take time off for illness.  I experienced GI pain and bleeding so severe that they nearly necessitated the ER.  Both TJU's Employee Health staff and Dr. Corey advised me not to return to Turner's employ for the sake of my health, but I insisted upon returning for a few days in order to help wrap up professional matters (as I felt a good professional would do).

55.    At that time, Dr. Turner demanded that I compose and complete complex Institutional Review Board forms required for a grant that would fund her research at the University of Pennsylvania.  When I complained about this misuse of TJU resources to Eric Righter and asked for his advice, he agreed that it was improper but advised me to do it anyway. He said Dr. Turner was at fault, not I, as shown in the memorandum I wrote to him on December 28, 1999, a copy of which is attached hereto and marked as Exhibit "T".

56.    The GI problem I experienced in December 1999 was a serious flare up and continuing problem that followed a long period without pain when things were well under control without medication.  I have not been without medications since and will require them for the rest of my life.  In addition, the stress which I suffered due to the hostile environment at TJU periodically causes me to suffer chest pains and severe headaches.  I have developed frequent migraines, which I didn't have before.

57.    The hostile environment I experienced working for Dr. Turner has also caused me to suffer from depression.  I am no longer social, declining invitations, avoiding social situations, and experiencing distance from friends and family.  Concentration is sometimes difficult.  I've lost most friends and references from Jefferson, which is depressing.  I often shut myself in, not going out for days or more; sometimes I cannot get out of bed.  In addition, I find

it difficult to function at work, and I cry more than I can ever recall.  It's sometimes crippling to be unable to search for a job or even answer a phone.  This is a complete change in my behavior; I was previously outgoing and social.

    I declare under penalty of perjury that the forgoing is true and correct.  Executed on October 14, 2003.


                     _____/s/_____
                      SONDRA G. DRUKER